**UNITED STATES INFORMATION AGENCY, VOICE OF AMERICA, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

**National Federation of Federal Employees, Intervenor.**

No. 90–1617.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 7, 1992.

Decided April 3, 1992.

Matthew M. Collette, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and William Kanter, Attorney, were on the brief, for petitioner.

Arthur A. Horowitz, Associate Solicitor, Federal Labor Relations Authority, with whom William E. Persina, Solicitor, William R. Tobey, Deputy Sol., and Denise Morelli, Attorney, were on the brief, for respondent.

Phillip R. Kete, with whom H. Stephan Gordon was on the brief, for intervenor. Anne L. Morgan and Jeff Sumberg also entered appearances for intervenor.

Katherine Sciacchitano was on the brief for amicus curiae urging that the decision and order of the Federal Labor Relations Authority be reversed.

Before: RUTH BADER GINSBURG, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge Sentelle.

SENTELLE, Circuit Judge:

The United States Information Agency, Voice of America ("VOA"), petitions for review of a negotiability determination made by the Federal Labor Relations Authority ("FLRA" or "Authority"). The FLRA found that a work jurisdiction proposal sought by the union representing prevailing wage rate employees at VOA was a mandatory subject of bargaining under § 704 of the Civil Service Reform Act. Additionally, the FLRA used its understanding of the "vitally affects" test to hold that the proposal remained a mandatory subject of bargaining notwithstanding any effect on employees outside the union's bargaining unit. We remand this action for further proceedings because the FLRA failed to provide a reasoned explanation of its application of § 704 and it misconstrued the vitally affects test.

## I. BACKGROUND

### A. *The Statutory Scheme*

■ The wages of most federal employees, including those at the VOA, are based on pay tables such as the General Schedule. However, a small percentage of federal workers, characteristically skilled trade technicians, have historically been paid on the basis of prevailing area wage rates. *See United States Information Agency v. FLRA*, 895 F.2d 1449, 1451 (D.C.Cir.1990)

("*USIA*"). Congress recognized the special status of prevailing wage rate employees in the Prevailing Rate Systems Act of 1972 ("PRSA"), Pub.L. No. 92–392, 86 Stat. 564 (codified as amended at 5 U.S.C. §§ 5341–5349 (1988)), which provides that the pay of these employees can be "fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." 5 U.S.C. § 5341. Moreover, § 9(b) of the PRSA preserves the right of prevailing wage rate workers to bargain over subjects contained in labor-management agreements in effect prior to August 19, 1972, the statute's date of enactment. 5 U.S.C. § 5343 note (codifying § 9(b) of the PRSA).

Congress continued to preserve pre–1972 subjects of bargaining for prevailing wage rate employees when it enacted § 704 of the Civil Service Reform Act of 1978 ("CSRA"), Pub.L. No. 95–454, § 704, 92 Stat. 1111, 1218 (codified at 5 U.S.C. § 5343 note). Generally, the CSRA precludes unions from bargaining over subjects that fall within the category of "management rights," such as the assignment of work. 5 U.S.C. § 7106 (specifying the management rights over which agencies have no duty to bargain). However, § 704(a) of the CSRA provides that "terms and conditions of employment" of prevailing rate employees "which were the subject of negotiation in accordance with prevailing rates and practices prior to August 19, 1972, shall be negotiated ... without regard to any provision of chapter 71 of title 5, United States Code." 5 U.S.C. § 5343 note.

As we summarized in *USIA*, "sections 9(b) and 704 serve to 'grandfather-in' bargaining rights for prevailing rate employees with respect to subjects that might otherwise be *non-negotiable* 'management rights.'" 895 F.2d at 1451. Thus, to overcome the management rights bar to negotiability, a new proposal must involve "terms and conditions of employment" that were "the subject of negotiation in accordance with prevailing rates and practices" prior to 1972.

B. *Negotiations Between the VOA and the NFFE*

The National Federation of Federal Employees ("NFFE") represents the prevailing wage rate radio broadcast technicians at the VOA, and the American Federation of Government Employees ("AFGE") represents all other union-member VOA employees. The NFFE's unit currently consists of about 140 employees responsible for the operation and maintenance of broadcast studios in the Operations Management Division of the VOA and the repair of electronic equipment.[1] These employees work in VOA offices in New York, Los Angeles, and, principally, Washington, D.C.

The present controversy stems from negotiations in 1988 over a new labor-management agreement. The NFFE proposed the inclusion of a detailed, seven-part work jurisdiction section that "describes the work that will be performed by bargaining unit members, exclusively. Work described in the proposal as being within the Union's jurisdiction could not be assigned ... to employees outside the bargaining unit." Letter from Mr. Bernhardt, NFFE representative, to Mr. Calhoun, chairman of the FLRA (Oct. 26, 1988), *reprinted in* J.A. at 48. As explained in the FLRA's brief, the proposal would make NFFE workers solely responsible "for the operation of all technical equipment, including the computer and automation systems, associated with the broadcast of VOA programs." Brief of Respondent at 8. The proposal, it bears emphasis, was not confined to equipment in the Studio Control Room or in the Operations Management Division.

When the VOA refused to bargain over the work jurisdiction proposal, the NFFE petitioned the FLRA for a negotiability determination. *See* 5 U.S.C. § 7502(a). The NFFE argued that jurisdiction had been discussed by the parties prior to 1972, and that § 704 of the CSRA therefore preserved the matter as a mandatory subject of bargaining. As evidence of these discussions, the NFFE referred to union meeting notes, signed by NFFE and VOA officials, of the negotiations between NFFE and VOA over their 1968 labor-management agreement. The first reference surfaces in § 2–15 of the notes recorded for July 7, 1966:

> It was agreed that all technical equipment in the studio and control room shall be operated by technical personnel only, ... and that it shall be the technician's responsibility to see that [the principles of good engineering practice] are maintained.

Union Meeting Notes of July 7, 1966, § 2–15, *reprinted in* J.A. at 9. The second reference is nearly identical to the first, appearing in § 2–15 of the meeting notes for October 11, 1967:

> It shall be the policy that all technical equipment in the Studio Control Room shall be operated by technical personnel only, and it shall be the technician's responsibility to see that program levels and quality shall follow the prescribed principles of good engineering practice, and that any digression from these practices shall be logged by the technician for action by the Technical Operations Division.

Union Meeting Notes of October 11, 1967, § 2–15, *reprinted in* J.A. at 13. Finally, § 2–16 of these same notes contains perhaps a third reference:

> Under this item the Union asks that no professional recording equipment, portable or otherwise, be operated by anyone

---

1. Specifically, the NFFE's bargaining unit consists of "all non-supervisory Radio Broadcast Technicians in the Master Control, Traffic, Studio, Recording, and Technical Support branches of the Technical Operations Division [located in Washington, D.C.] ... and to all non-supervisory radio broadcast technicians assigned to the New York News Bureau." 1984–88 Negotiated Labor–Management Agreement between the USIA and the NFFE, Local 1418, art. II, § 2, *reprinted in* Joint Appendix ("J.A.") at 36. Additionally, NFFE represents a radio broadcast technician in VOA's Los Angeles bureau. The VOA has substantially reorganized its operations since the parties executed the 1984–88 Agreement, renaming the Technical Operations Division as the Operations Management Division, and expanding the Traffic branch into a separate division.

other than a technician. There was no agreement on this proposal.

*Id.* § 2–16, *reprinted in* J.A. at 13. Although the final 1968 labor-management agreement did not specifically mention these items, Article VIII of that agreement indicates that the policies and practices reflected in the written meeting notes would continue in effect until changed or superseded.[2]

Without holding a factual hearing, the FLRA agreed with the NFFE that the proposal was negotiable under CSRA § 704(a) because jurisdiction over work was a matter negotiated by the parties prior to 1972. *National Federation of Federal Employees, Local 1418 and United States Information Agency, Voice of America,* 37 F.L.R.A. 1385, 1392–93 (1990). Relying on the union meeting notes cited above as dispositive evidence of pre–1972 negotiations, the FLRA found no distinction between the NFFE's current work jurisdiction proposal and the subject of § 2–15 of the 1967 meeting notes. *Id.* at 1393. Additionally, the FLRA found that the work jurisdiction proposal constituted a term and condition of employment because it "concern[ed] the assignment of work." *Id.* at 1398. Accordingly, the FLRA concluded that § 704(a) of the CSRA obligated the VOA "to bargain over the [NFFE's] proposal concerning the work which shall be assigned to radio technicians." *Id.* at 1391.

Defending its refusal to negotiate, the VOA asserted that the work jurisdiction proposal would expand the NFFE's bargaining unit by requiring the VOA to reassign to NFFE workers technical work then performed by AFGE employees. The VOA expressly urged before the Authority, as it does here, that the NFFE proposal concerned the scope of the bargaining unit, and not simply work jurisdiction. The FLRA responded by pointing out that some of the work now performed by AFGE employees was "associated with the operation of new technical equipment that was installed at [VOA] to fulfill the same functions as those traditionally performed" by NFFE workers. *Id.* at 1400. Thus, the FLRA found that the work jurisdiction proposal did not seek to expand the NFFE bargaining unit, but rather served to define "bargaining unit technicians' responsibilities in light of the changes in the [VOA's] operation." *Id.* at 1402. And, despite its effect on AFGE workers, the FLRA found the proposal to be a mandatory subject of bargaining because it "vitally affect[ed] the terms and conditions of employment of [NFFE] bargaining unit technicians." *Id.* at 1401.

From this decision, the VOA filed a timely appeal to this Court under 5 U.S.C. § 7123(a). The AFGE has entered an appearance as *amicus* in support of the VOA and the NFFE has intervened in support of the FLRA.

## II. Discussion

### A. *Standard of Review*

We review decisions of the FLRA under the arbitrary and capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *See* 5 U.S.C. § 7123(c); *National Treasury Employees Union v. FLRA,* 826 F.2d 114, 121 (D.C.Cir.1987) (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444–45 n. 8, 78 L.Ed.2d 195 (1983)). And, though the FLRA's construction of the PRSA is not

---

**2.** Article VIII, § 2, of the 1968 Employee–Management Cooperation Agreement between USIA and NFFE states:

Established and recognized policies, procedures, or practices which were in effect prior to the effective date of this agreement and are not specifically covered in this agreement shall remain in effect until changed or superseded provided they are not in violation of law, executive order, or government regulations or policies. This includes the conclusions reached at meetings between UNION

and Agency (personnel and management) representatives as reflected in the written meeting notes.

J.A. at 20. Moreover, Article XVI, § 4, of the agreement states:

The parties agree that, pending the settlement or adjustment of any issue arising between them by the means provided in this agreement, there shall be no change in the conditions of any written understanding applicable to such issue.

J.A. at 27.

entitled to deference, as that statute is not its organic statute, *USIA*, 895 F.2d at 1452, we have recognized that negotiability and unfair labor practice determinations are "best left to the expert judgment of the FLRA in the first instance." *Id.* at 1455. *See also United States Dep't of Interior, Bureau of Ind. Affairs v. FLRA*, 887 F.2d 172, 175 (9th Cir.1989) ("*BIA*") (declaring that since "the [CSRA] has specifically conferred upon the [FLRA] the determination of what is negotiable in collective bargaining the [FLRA] is correct in its contention that deference is owed its decision").

None of this, however, relieves the FLRA of its obligation under the APA to provide a "rational explanation" for its decisions. *Fort Bragg Ass'n of Educators v. FLRA*, 870 F.2d 698, 701 (D.C.Cir.1989). "[T]he key to the arbitrary and capricious standard is its requirement of reasoned decisionmaking: we will uphold the [agency's] decision if, but only if, we can discern a reasoned path from the facts and considerations before the [agency] to the decision it reached." *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 639 (D.C.Cir.1984). *See, e.g., American Mining Congress v. U.S. EPA*, 907 F.2d 1179, 1187 (D.C.Cir. 1990) (emphasizing that deference to the EPA's expert judgment does not relieve a reviewing court of its duty to ensure reasoned agency decisionmaking, and explaining that courts "are not at liberty to 'supply a reasoned basis for the agency's action that the agency itself has not given.'" (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)))).

## B. *The Merits*

■ We observed in *USIA* that "the critical inquiry [under § 704(a) ] is whether the proposed subject for negotiation is a matter that was negotiated by the parties prior to August 19, 1972." 895 F.2d at 1453. However, we did not have occasion in that case to address the thorny interpretive question of how squarely a current proposal must fit within the corners of a pre–1972 subject of negotiation for the former to be grandfathered by § 704(a). Because the FLRA did not provide us with its reasoned interpretation of § 704(a) in the challenged order, we have nothing to review, and must therefore remand this action to the FLRA. *See City of Kansas City v. HUD*, 923 F.2d 188, 189 (D.C.Cir.1991) (remanding an agency decision because "HUD has offered no reasoned interpretation of [a statutory provision] to which we can defer").

Though we leave this question in the first instance to the FLRA, it is possible that the work jurisdiction proposal does not meet the requirements of § 704. We suggest that on remand the Authority should consider the treatments of similar questions by the Ninth and Tenth Circuits. In *United States Dep't of Interior, Bureau of Reclamation v. FLRA*, 908 F.2d 570 (10th Cir.1990) ("*Bureau of Reclamation*"), the Tenth Circuit reversed an FLRA decision ordering the parties to negotiate over Sunday premium pay because prior to 1972 they had negotiated over other premium pay subjects. *Id.* at 573–74. Relying on its examination of legislative history, the court believed that Congress enacted §§ 704 and 9(b) "to preserve the status quo, not to expand the scope of the bargaining obligations between federal employers and prevailing rate employees." *Id.* at 574. Expansive interpretations of § 704, warned the court, would frustrate congressional intent, for "almost any subject of negotiations could somehow be connected to one which was previously the subject of negotiations." *Id.* Accordingly, the Tenth Circuit concluded that § 704 preserved for bargaining only those subjects that had been "specific[ally]" negotiated prior to 1972. *Id.* at 575.[3]

---

3. Finding that Congress had statutorily created a variety of premium pay methods, the Tenth Circuit held that "it would be a misinterpretation of Section 704(a) to conclude that negotiation of any type of premium pay operated to preserve the negotiability of all others." *Bureau of Reclamation*, 908 F.2d at 575. Critical to the court, then, was its finding that the "variety of types of premium pay detailed by the Congress demonstrates that Congress does not view 'pre-

Using a less categorical approach, the Ninth Circuit in *BIA* addressed a near identical wage negotiation issue. That circuit reversed the FLRA's broad reading of § 704, under which it had mandated negotiations over different types of wages because wages had been negotiated prior to 1972. *BIA*, 887 F.2d at 176. As in *Bureau of Reclamation*, the Ninth Circuit observed that Congress "has not treated the wages of federal employees as a simple uniform topic.... Given this way of legislating, it is a perversion of the statute to interpret it as saying that since wages were once negotiated, any and all wage increases are open to negotiation in the future." *Id.* Unlike the Tenth Circuit, however, the *BIA* court did not declare that § 704 should be applied narrowly in all cases to preserve only specific pre–1972 subjects, but rather appeared to engage in a contextual examination of the particular subject of negotiations.

The Authority, in the decision now under review, did not fully consider either of the approaches discussed in *Bureau of Reclamation* or *BIA*. The Authority did attempt to distinguish the facts of the Ninth Circuit's *BIA* decision, 37 F.L.R.A. at 1400, but it offered no insight into how the FLRA itself interprets § 704. Likewise, the Authority stated that *Bureau of Reclamation* had been accepted "only as the law of that case," and claimed that the Authority had adopted instead our *USIA* interpretation of § 704. *Id.* at 1399. FLRA counsel continued this theme in the Authority's brief, suggesting that the *USIA* court embraced a broad interpretation of § 704(a). Brief of Respondent at 21. As we related above, it is not accurate to say that the *USIA* court adopted a broad or any other reading of § 704. In that case we examined only whether a proposal regarding clean-up time should be characterized as either a term and condition of employment or a pay and pay practice. *USIA*, 895 F.2d at 1454–55. We did not purport to determine the breadth of § 704 as it relates to a pre–1972 negotiation "subject."

Nor will we determine its breadth today, as proceedings on remand may either obviate the necessity, or provide a clear administrative record upon which to base our decision. On the present record, we cannot determine whether the Authority made "findings that support its decision" and "articulate[d] [a] rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

The FLRA counsel, in the Authority's brief, argued that a clause in § 9(b), which permits "modification" of earlier agreements, when read in conjunction with § 704(a), gives "parties who had negotiated over a subject matter prior to August 19, 1972, a broad scope for negotiation." Brief of Respondent at 19, 20–21. The FLRA's interpretation of § 704(a), however, must come from the Authority when explaining its adjudicatory decisions, not from its appellate counsel when defending those decisions. *Investment Co. Inst. v. Camp*, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands."); *Kansas City v. HUD*, 923 F.2d at 192 (" 'Arbitrary and capricious' review ... demands evidence of reasoned decision-making *at the agency level;* agency rationales developed for the first time during litigation do not serve as adequate substitutes.") (citations omitted). As the FLRA's decision itself offers no reasoned interpretation of § 704(a) as applied to the facts of this case, we remand for further consideration and a fuller explanation.

■ We also find a remand necessary for the FLRA to reconsider its use of the vitally affects test, which we recently clarified in *Department of the Navy v. FLRA*, 952 F.2d 1434 (D.C.Cir.1992). The Authority had used the vitally affects test to dispose of the VOA's argument that the work jurisdiction proposal did not fall within the mandatory scope of bargaining because it affected employees outside the NFFE's

mium pay' as a generic term. Rather, 'premium pay' encompasses several specific types of pay

above the basic level." *Id.*

bargaining unit. The Authority did not dispute the claim that non-NFFE employees would be affected by the jurisdiction proposal, but offered that in

determining whether there is a duty to bargain over matters concerning conditions of employment of bargaining unit employees that also affect employees or positions outside the unit, the Authority will examine how the proposal affects the conditions of employment of employees in the bargaining unit. If the proposal: (1) vitally affects the working conditions of unit employees; and (2) is consistent with applicable law and regulations, it is negotiable.

37 F.L.R.A. at 1401 (citations omitted).

The Authority then concluded that since the jurisdiction proposal vitally affected NFFE employees, and the VOA had not shown that the proposal was inconsistent with applicable laws or regulations, the VOA had a duty to bargain "notwithstanding [the proposal's] effect on nonunit employees." *Id.* (citing *AFGE, Local 32 and OPM,* 33 F.L.R.A. 335, 338–39 (1988)).

In *Navy v. FLRA,* however, we said that we were "not aware of any case—in either the public or private sectors—in which an employer has been required to bargain with a union over the conditions of employment of *employees in another bargaining unit.*" 952 F.2d at 1442. Here, the Authority did not query into whether or how the jurisdiction proposal would affect the conditions of employment of AFGE employees, nor did the Authority provide AFGE with an opportunity to participate in this dispute. Similarly, though the FLRA found that the work jurisdiction proposal "define[d]" the NFFE's bargaining unit in "light of the changes in the [VOA's] operations," 38 F.L.R.A. at 1402, it failed to consider the appropriateness of a unit clarification proceeding under 5 C.F.R. § 2422.2.

It seems likely that if the jurisdiction proposal is a condition of employment for NFFE workers because it "concerns the assignment of work," then AFGE workers will have an analogous claim. Of course, on remand the FLRA may find that the jurisdiction proposal will not affect the conditions of employment of AFGE workers.

Or, it may be that the FLRA will interpret § 704(a) as grandfathering proposals regardless of their effect on employees represented by other unions. If so, then we would expect the FLRA to fulfill its duty under the APA and offer a reasoned explanation of this interpretation, giving due regard to our admonition in *Navy v. FLRA* that proposals regulating "the conditions of employment of members of other bargaining units ... are impermissible under the FSLMRS." 952 F.2d at 1443.

In light of *Navy v. FLRA,* we remand so that the FLRA may reconsider its finding that the work jurisdiction proposal constituted a mandatory subject of bargaining. We also expect the FLRA to explain, with record evidence, whether the proposal alters the NFFE's and the AFGE's bargaining units, and if so, whether the FSLMRS demands that the parties resolve this issue through a negotiability determination or a unit clarification proceeding.

### III. CONCLUSION

Because the FLRA did not fulfill its duty to engage in reasoned decisionmaking, and in light of this Circuit's recent clarification of the vitally affects test, we remand the FLRA's decision in this action for reconsideration.