**UNITED STATES DEPARTMENT OF the INTERIOR, BUREAU OF RECLAMATION, Washington, D.C., Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

**International Brotherhood of Electrical Workers; Columbia Basin Trades Council, Intervenors.**

**No. 92–1625.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 4, 1994.

Decided May 20, 1994.

---

Katherine E. Gruenheck, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for petitioner. With her on the briefs was William Kanter, Atty., U.S. Dept. of Justice, Washington, DC.

William E. Persina, Atty., Federal Labor Relations Authority, Washington, DC, argued the cause, for respondent. With him on the brief was David M. Smith, Sol., Federal Labor Relations Authority, Washington, DC.

On the brief for intervenors Columbia Basin Trades Council and Intern. Broth. of Elec. Workers were Elihu I. Leifer, Washington, DC, and Richard H. Robblee, Seattle, WA.

Before: EDWARDS, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, the Department of the Interior ("Interior" or "DOI") challenges an order of the Federal Labor Relations Authority ("FLRA" or "Authority") requiring DOI to bargain with unions representing "prevailing rate" employees over the inclusion of supervisors in bargaining units that also included non-supervisory employees. The FLRA found that Interior committed an unfair labor practice by unilaterally removing supervisors from the affected bargaining units and then refusing to bargain over the issue. In reaching this result, the Authority held that, under section 9(b) of the Prevailing Rate Systems Act of 1972 ("PRSA")[1] and section 704(a) of the Civil Service Reform Act of 1978 ("CSRA"),[2] the inclusion of supervisors in a bargaining unit was a mandatory subject of bargaining because it was a subject of negotiation prior to the enactment of the PRSA. *See United States Dep't of Interior,* 46 F.L.R.A. No. 2 (1992) ("FLRA Decision").

The language and legislative history of sections 704 and 9(b) make clear that those provisions preserve for prevailing rate workers whatever rights they possessed prior to August 19, 1972, the date of enactment of the PRSA; however, those sections do not create any new rights. The issue presented by this petition is not the permissibility of including supervisors in bargaining units, but rather the *bargainability* of that subject. In this case, as we have in other decisions reviewing orders of the FLRA, we look to private sector labor practices for analogues to guide our interpretation. There is no question that, since the passage of the Taft–Hartley Act in 1947, the inclusion of supervisors in bargaining units of non-supervisory personnel has been no more than a permissive subject of bargaining in the private sector. Thus, because we find no clear evidence of a different practice in the federal sector and no

---

1. Pub.L. No. 92–392, 86 Stat. 564, 574 (1972) (codified at 5 U.S.C. § 5343 note (1988)).

2. Pub.L. No. 95–454, 92 Stat. 1111, 1218 (1978) (codified at 5 U.S.C. § 5343 note (1988)).

indication that Congress intended the PRSA or CSRA to grant any new rights to prevailing rate employees, we hold that those Acts preserve the inclusion of supervisors in "mixed" units only as a *permissive* subject of collective bargaining.

## I. BACKGROUND

### A. *Statutory Framework*

The workers involved in this dispute are "prevailing rate" employees. This court explained the statutory scheme governing such employees in *United States Information Agency v. FLRA*, 895 F.2d 1449 (D.C.Cir. 1990) ("*USIA*"), a decision that also interpreted sections 9(b) and 704. "Prevailing rate employees are a category of federal workers whose wages are not determined by the federal General Schedule. Rather, their wages generally are determined by the wages prevailing in the industry in which they work, pursuant to a wage survey mechanism." *Id.* at 1451 (quoting *United States Dep't of Energy v. FLRA*, 880 F.2d 1163, 1164 n. 2 (10th Cir.1989)). The PRSA, enacted in 1972, established a mechanism for determining and adjusting the wages of prevailing rate employees based upon surveys of rates of pay for various trades and crafts in different geographic areas. In addition, in section 9(b) of the PRSA, Congress "pre-

served the rights of parties to collective bargaining agreements in effect on August 19, 1972, to negotiate 'with respect to the various items of subject matter of negotiations on which' those contracts were based." *USIA*, 895 F.2d at 1451 (quoting PRSA § 9(b)(3)).[3] Section 9(b) provided, in particular, that the PRSA did not modify or prevent the renegotiation of any contract provision "pertaining to wages, the terms and conditions of employment, and other employment benefits" in collective bargaining agreements in place on or before the date of the PRSA's enactment.

When Congress enacted the CSRA in 1978, it "again provided for the protection of bargaining rights for prevailing rate employees." *Id.* The CSRA provided a "management rights" section, specifying subjects about which unions were precluded from bargaining. *See* 5 U.S.C. § 7106 (1988). However, section 704 of the CSRA served to "overcome the management rights bar to negotiability" for those subjects which it covers. *United States Information Agency v. FLRA*, 960 F.2d 165, 166 (D.C.Cir.1992). Section 704(a) provides that "wages, terms and conditions of employment, and other employment benefits" which were subjects of negotiation prior to August 19, 1972 "shall be negotiated" in accordance with section 9(b).[4]

---

3. Section 9(b) provides that:

The amendments made by this Act ... shall not be construed to—

(1) abrogate, modify, or otherwise affect in any way the provisions of any contract in effect on the date of enactment of this Act [Aug. 19, 1972] pertaining to the wages, the terms and conditions of employment, and other employment benefits, or any of the foregoing matters, for Government prevailing rate employees and resulting from negotiations between Government agencies and organizations of Government employees;

(2) nullify, curtail, or otherwise impair in any way the right of any party to such contract to enter into negotiations after the date of enactment of this Act [Aug. 19, 1972] for the renewal, extension, modification, or improvement of the provisions of such contract or for the replacement of such contract with a new contract; or

(3) nullify, change, or otherwise affect in any way after such date of enactment [Aug. 19, 1972] any agreement, arrangement, or understanding in effect on such date [Aug. 19, 1972] with respect to the various items of subject matter of the negotiations on which any such contract in effect on such date [Aug. 19, 1972] is based or prevent

the inclusion of such items of subject matter in connection with. the renegotiation of any such contract, or the replacement of such contract with a new contract, after such date [Aug. 19, 1972].

5 U.S.C. § 5343 note (1988) (bracketed material in original).

4. Section 704(a) provides in relevant part:

(a) Those terms and conditions of employment and other employment benefits with respect to Government prevailing rate employees to whom section 9(b) of Public Law 92–392 applies which were the subject of negotiation in accordance with prevailing rates and practices prior to August 19, 1972, shall be negotiated on and after the date of enactment of this Act in accordance with the provisions of section 9(b) of Public Law 92–392 without regard to any provision of chapter 71 of title 5, United States Code (as amended by this title), to the extent that any such provision is inconsistent with this paragraph.

5 U.S.C. § 5343 note (1988) (bracketed material omitted). In contrast, section 704(b), which is not implicated in this case, provides for the nego-

As we held in *USIA,* "sections 9(b) and 704 serve to 'grandfather-in' bargaining rights for prevailing rate employees with respect to subjects that might otherwise be *non-negotiable* 'management rights' under 5 U.S.C. § 7106 or *non-negotiable* pay provisions reserved to agency regulation." *Id.* at 1451 (emphasis in original). In short, the two sections preserve historical subjects of collective bargaining that otherwise would be preempted by the PRSA or CSRA, or by other federal labor statutes.

■ However, simply stating that sections 9(b) and 704 preserve historical subjects of collective bargaining does not resolve the question that is at the heart of the instant dispute: whether a particular "historical subject" is preserved as a mandatory or permissive subject of bargaining. At the time when the PRSA and CSRA were passed, it was well-settled in private sector labor law that an employer would be found guilty of an unfair labor practice upon refusing to bargain collectively with its employees' representative over so-called "mandatory subjects," which the National Labor Relations Act ("NLRA") defines as "wages, hours, and other terms and conditions of employment." *See NLRB v. Borg-Warner Corp.,* 356 U.S. 342, 348–49, 78 S.Ct. 718, 722–23, 2 L.Ed.2d 823 (1958). Thus, an employer is forbidden from making a unilateral change in a mandatory subject of bargaining without first negotiating to impasse. *See Litton Financial Printing Div. v. NLRB,* 501 U.S. 190, 197–99, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991). So-called "permissive subjects," in contrast, are those over which the parties *may* bargain, but neither party may lawfully insist upon agreement on such issues as a condition to a labor agreement. *See Borg-Warner Corp.,* 356 U.S. at 349, 78 S.Ct. at 722. In the instant case, the FLRA determined that all historical subjects of bargaining were converted into mandatory subjects by sections 9(b) and 704. DOI claims that the inclusion of supervisors in a bargaining unit that includes non-supervisors is a permissive subject.

tiation of "pay and pay practices," in accordance with practices *currently* prevailing in the industry. *See USIA,* 895 F.2d at 1454–55.

**B. Factual and Procedural History**

In 1949, the Bureau of Reclamation, a division of the Department of the Interior, informally recognized an installation-wide bargaining unit of prevailing rate employees at one of its hydroelectric facilities, the Grand Coulee Project in Washington state. In 1963, the Bureau recognized a bargaining unit at the Central Valley Project in California. These units are represented, respectively, by the Columbia Basin Trades Council and the International Brotherhood of Electrical Workers ("the unions"). Until 1990, when DOI took the unilateral actions at issue in this case, these were "mixed" units—that is, they included both supervisory and nonsupervisory personnel.

In 1990, prior to the renewal of the collective bargaining agreements at the Grand Coulee and Central Valley Projects, DOI unilaterally withdrew its recognition of the unions as representatives of two supervisory positions, Foreman II and III, at the two facilities.[5] DOI refused to bargain over these supervisors' wages, denied application of the new contracts to the supervisors, and refused to honor the supervisors' assignment of union dues. As authority for its unilateral actions, DOI relied on the Tenth Circuit's decision in *Department of Energy v. FLRA,* 880 F.2d 1163 (10th Cir.1989), a case which is squarely on point with the instant dispute. That decision upheld the Department of Energy's refusal to bargain over wages with supervisors within an FLRA-recognized unit of prevailing rate employees. The Authority argued in that case that section 704 gave the unit employees the right to bargain over the supervisors' inclusion in the unit because they had been included in it prior to the effective date of the PRSA. The Tenth Circuit held that, although there was evidence in the record that the agency had in fact bargained over the scope of the unit prior to 1972, sections 9(b) and 704 simply preserved the "negotiability" of including the supervisors in the unit. *See Department of Energy,*

5. None of the parties to this case disputes that the Foreman II and III positions are in fact supervisory positions.

880 F.2d at 1170. In other words, the statutes made mixed units a permissive subject of bargaining.

The unions in this case argued before the FLRA that DOI's unilateral removal of the supervisors from the bargaining units constituted an unfair labor practice. The two cases were consolidated, and the facts were stipulated by the parties. The FLRA General Counsel, the unions, DOI, and the Authority itself recognized that *Department of Energy* was on all fours with the instant case, but because this dispute arose outside the jurisdiction of the Tenth Circuit, the Authority declared that it was not bound by that decision, and declined to follow its reasoning. *See* FLRA Decision at 15–20, 26.

The Authority's decision in this case purported to rely on the language and legislative history of sections 9(b) and 704 to rule that those provisions made the inclusion of supervisors in units that were "mixed" prior to the enactment of the PRSA a mandatory subject of bargaining:

> In our view, the wording of the savings clauses enacted by Congress was broad and included matters relating to employees' unit status, and benefits derived from that unit status, before section 9(b) of the PRSA was enacted. We conclude that Congress intended section 9(b) to include all matters that had been negotiated prior to August 19, 1972.... Stated otherwise, Congress' use of the phrase "terms and conditions of employment and other employment benefits" was simply a way of describing all matters that parties had negotiated....

*Id.* at 23. The FLRA further stated that "*any subjects* preserved for negotiation under section 9(b) and section 704 are mandatory subjects of bargaining." *Id.* at 24 (emphasis added).

The FLRA granted a "*status quo ante*" remedy to the affected supervisory employees. DOI petitioned this court for review of the Authority's decision, the Authority cross-petitioned for enforcement and the unions intervened in support of the FLRA.

## II. DISCUSSION

### A. *Standard of Review*

■ "[T]he FLRA's interpretation of the Prevailing Rate Systems Act is not entitled to deference, because that Act is not the agency's own organic statute." *USIA*, 895 F.2d at 1452 (citing *Department of the Treasury v. FLRA*, 838 F.2d 1341, 1342 n. * (D.C.Cir.1988) (*per curiam*)). Both this court and the Tenth Circuit agree that the FLRA's interpretation of section 704 of the CSRA is owed no deference for the same reason. *Id.* (citing *Department of Energy*, 880 F.2d at 1166). As we stated in *USIA*, "discerning the meaning of section 704 presents a pure question of statutory construction. When presented with such a 'pure' question, the court's first job is to try to determine congressional intent using traditional tools of statutory construction." *Id.* (internal quotations omitted).

### B. *Whether Unit Composition is a Historical Subject of Bargaining*

■ The parties devote a great deal of space in their briefs to arguments as to whether the inclusion of supervisors in these bargaining units was in fact a subject of collective bargaining prior to the enactment of the PRSA in 1972. Interior argues that it "voluntarily recognized" the mixed units, but that it was under no compulsion to do so—in other words, that its historical understanding was that mixed units were a permissive subject.[6] The Authority contends that the collective bargaining agreements between Interior and the unions explicitly provide that supervisors are to be included in the units,

---

**6.** DOI also attempts to argue that the unions conceded before the Authority in their statement of stipulated facts that Interior voluntarily recognized the mixed units at issue. Only a hypertechnical parsing of the stipulations will support this contention, while common sense weighs heavily against it. If the unions in fact intended to concede that there had been no bargaining over this issue, then there simply would be no case for them to bring—all of their arguments necessarily depend on sections 9(b)'s and 704's preservation of historical subjects of bargaining. We decline Interior's invitation to ignore the substance of all of the FLRA's and the unions' arguments based upon a crabbed reading of the parties' stipulations.

and that accordingly we must conclude that the parties negotiated over their inclusion.

On the basis of the record before us, we find that there is simply no way to determine whether the parties to the contracts at issue understood mixed units to be a mandatory or permissive subject prior to August 1972. Even if it were possible to determine the parties' historical views on this matter, this dispute presents a question of law as to which their intentions are wholly irrelevant. What is apparent in this case, as all parties agree, is that prior to the enactment of the PRSA, DOI and the unions negotiated a series of contracts covering mixed units which included the supervisory positions at issue here. Accordingly, the *negotiability* of the inclusion of the Foreman II and III positions is preserved by sections 9(b) and 704, because there is no doubt that the inclusion of supervisors in the units at issue was one of the benefits of the unions' bargains resulting from pre–1972 negotiations.

This court held in *USIA* that section 704(a) means what its plain language suggests: "to determine negotiability ... [the FLRA] need only determine which subjects were negotiated prior to August 19, 1972," the date the PRSA was enacted. *USIA*, 895 F.2d at 1454. Thus, unit composition remains a *bargainable* subject—that is, whether or not current federal sector labor law otherwise would permit the inclusion of supervisors in a bargaining unit,[7] sections 704 and 9(b) preserve the parties' right to provide for mixed units in their contracts. The key question, however, is whether a demand for a mixed unit is preserved as a mandatory or permissive subject of bargaining.

### C. *The Scope of Sections 9(b) and 704*

The FLRA argues that our decision in *USIA* supports its ruling that sections 9(b) and 704 converted all subjects of pre-PRSA negotiation into mandatory subjects. *USIA* held, however, only that section 704(a) preserved the *bargainability* of subjects negoti-

ated prior to enactment of the PRSA. The decision said nothing about mandatory versus permissive subjects of bargaining, because the issue was not presented in that case. In *USIA,* the employing agency unilaterally reduced the cleanup and preparation time it allowed its workers, arguing that the currently prevailing industry practice was to allow no cleanup time, and that section 704 required bargaining only to the extent that subjects were bargained in currently prevailing practice. The FLRA held that the agency was required to bargain over the issue because it had been a subject of negotiations prior to the enactment of the PRSA. This court upheld the Authority's interpretation, but remanded the case to permit the FLRA to determine whether cleanup and preparation times were a "term or condition of employment" covered by section 704(a), or a "pay and pay practice" covered by the different provisions of 704(b). Thus, the sole issue decided in *USIA* was that section 704(a) preserved the bargainability of all pre-PRSA subjects of negotiation, rather than only those negotiable under currently prevailing industry practices.

To decide whether the FLRA erred in ruling that sections 704 and 9(b) converted all pre-PRSA subjects into *mandatory* subjects, we look, as we have in other cases construing federal sector labor statutes, to private sector labor law for analogues to guide our interpretation. *See, e.g., Department of the Navy v. FLRA,* 952 F.2d 1434, 1439 (D.C.Cir.1992) ("private labor law concepts may be used to inform interpretation of the FSLMRS; indeed, we have so held on several occasions"); *American Fed'n of Gov't Employees v. FLRA,* 853 F.2d 986, 992 (D.C.Cir.1988) (FSLMRS was modeled on the NLRA, and "its provisions were crafted either by analogy or by contrast"). Indeed, in the instant case, as we discuss below, we have particular reason to look to private sector practice, as the legislative histories of both the PRSA and CSRA indicate that Congress sought to preserve for prevailing rate

7. The Federal Service Labor–Management Relations Statute ("FSLMRS") prohibits the FLRA from certifying mixed bargaining units. *See* 5 U.S.C. § 7112(b)(1). When asked at oral argument, counsel for the FLRA was uncertain

whether the Authority interprets the FSLMRS as permitting federal agencies to recognize mixed units voluntarily, an issue not presented in the instant case, and we express no opinion on that question.

employees precisely the scope of bargaining that was provided in the private sector at that time.

There is no question that since the passage of the Taft–Hartley Act in 1947, the inclusion of supervisors in bargaining units has been no more than a permissive subject in the private sector. Section 14(a) of the NLRA, 29 U.S.C. § 164(a) (1988), which was added by Taft–Hartley, permits supervisors to join unions, but also provides that no employer can be compelled to recognize supervisors as "employees" protected by the Act. Accordingly, employers have the right to refuse to bargain with supervisors, although they may voluntarily agree to bargain over mixed units. *See Florida Power & Light Co. v. IBEW Local 641*, 417 U.S. 790, 813 n. 23, 94 S.Ct. 2737, 2749 n. 23, 41 L.Ed.2d 477 (1974) ("[W]hile a union violates [NLRA] § 8(b)(1)(B) by striking to force an employer to agree to hire only union members as foremen, it can propose that supervisors be covered by the collective bargaining agreement.") (internal citation omitted); *accord Sakrete of Northern Cal., Inc. v. NLRB*, 332 F.2d 902, 908 (9th Cir.1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965).[8] Thus, when Congress enacted the PRSA in 1972, it had long been the law in the private sector that mixed bargaining units were a permissive subject.

■ The plain language of sections 9(b) and 704 makes clear that those statutes do not create any new rights for prevailing wage employees, but merely preserve whatever rights those workers enjoyed at the time the statutes were enacted. Section 9(b)(1) states that the PRSA does not "abrogate, modify, or otherwise affect" contract provisions in effect on August 19, 1972. Section 9(b)(2) provides that the PRSA does not "nullify, curtail, or otherwise impair" the right of the parties to the contracts saved in section 9(b)(1) to negotiate for "renewal, extension,

modification, or improvement" of those agreements. Congress provided in section 704 that "terms and conditions of employment and other employment benefits ... which were the subject of negotiation" prior to enactment of the PRSA "shall be negotiated" in accordance with section 9(b). Nothing in these sections refers even obliquely to conferring new rights, or to altering the scope of mandatory subjects of collective bargaining between the parties to the covered agreements.

The FLRA has relied heavily on the legislative history of sections 9(b) and 704. According to the Authority, the legislative history expresses Congress' approval of collective bargaining practices in the prevailing rate sector prior to the PRSA. The FLRA points in particular to the House Report's statement that section 704 was intended to "preserve unchanged the scope and substance of the existing collective bargaining relationship between the employees' representatives and the agencies involved." H.R.REP. No. 1403, 95th Cong., 2d Sess. 62 (1978). We agree with the Authority's contention that this and other passages in the legislative history of both sections 9(b) and 704 evince a clear congressional intent to preserve the collective bargaining status quo for prevailing rate employees. This observation begs the real question, however, as it does not tell us what that status quo was— that is, which subjects were mandatory and which permissive when the PRSA was enacted.

We find that the legislative history of sections 9(b) and 704 yields only one unequivocal statement of congressional intent as to whether unit composition is a mandatory subject: The Conference Committee report on section 704, one of the documents the FLRA relied upon in its decision, notes that the section

---

8. Although neither party appears to have raised the point in that case, the cleanup and preparation time issue addressed in *USIA* plainly would have been a mandatory subject under private sector labor law. This court declined to decide whether the matter fell within the scope of "pay and pay practice," or simply was a "term or condition of employment"; but in either case,

that issue definitely concerned wages and/or hours, both of which are mandatory subjects under the NLRA. *See* 29 U.S.C. § 158(a)(5), (d) (1988). Thus, although *USIA* did not address the mandatory/permissive distinction, that decision fits easily within our analysis of the instant dispute.

provides specific statutory authorization for the negotiation of wages, terms and conditions of employment and other employment benefits *traditionally negotiated by these employees in accordance with prevailing practices in the private sector of the economy.*

H.R.REP. No. 1717, 95th Cong.2d Sess. 159 (1978), U.S.Code Cong. & Admin.News pp. 2723, 2893. (emphasis added). This statement of legislative intent, coupled with the principle that federal sector labor law often is guided by settled authority from the private sector, persuades us that sections 9(b) and 704 were designed to preserve for prevailing rate employees the same scope of bargaining enjoyed by private sector workers for those issues that were subjects of negotiation prior to enactment of the PRSA.

Congress referred repeatedly in both sections 9(b) and 704, and in the accompanying legislative reports,[9] to preserving prevailing rate workers' rights to bargain as those rights existed in 1972. The only reasonable understanding of what those rights were can be had by reference to private sector practice at that time. Counsel for the FLRA contended at oral argument that Congress enacted the statutes at issue to preserve "a system that was working." We agree, but note that the FLRA's decision in this case turns that rationale completely on its head by holding that all contract terms in existence in 1972 were *converted* into mandatory subjects. This decision is incomprehensible, for the "system" that was in place in 1972 included both mandatory and permissive subjects. Quite simply, by converting all contract terms into mandatory subjects, Congress would have worked a *radical change* in the substantive collective bargaining relationships of the parties. There is no evidence that this is what Congress intended to do, thus the Authority's position in this case is meritless.

### III. CONCLUSION

For the foregoing reasons, the petition for review is granted, and the cross-petition for enforcement is denied. The FLRA's decision is, accordingly, vacated.

*So ordered.*

---

9. *See* H.R.REP. No. 1403, 95th Cong., 2d Sess. 61–62 (1978) (section 704 intended "to preserve the existing right of certain Federal prevailing rate employees to negotiate terms and conditions of employment"); S.REP. No. 791, 92d Cong.2d Sess. 6 (1972) U.S.Code Cong. & Admin.News pp. 2980, 2985. (section 9(b) intended to prevent "disruption or modification of existing ... bargaining agreements"); H.R.REP. No. 339, 92d Cong., 1st Sess. 22 (1971) (section 9(b) not intended to affect the "status of such contracts or to impair the authority of the parties concerned to renegotiate existing contracts or enter into new agreements").