AMERICAN BUS ASSOCIATION,
Appellant,

v.

Rodney E. SLATER, Secretary of
Transportation, Appellee.

No. 99–5390.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 2000.

Decided Nov. 14, 2000.

Richard A. Allen argued the cause for appellant. With him on the briefs were Richard P. Schweitzer, Craig M. Cibak and Jol A. Silversmith.

Sandra Wien Simon, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were David W. Ogden, Acting Assistant Attorney General, Marleigh D. Dover, Attorney, Nancy E. McFadden, General Counsel, U.S. Department of Transportation, and Paul M. Geier, Assistant General Counsel.

Before: WILLIAMS, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

American Bus Association ("ABA") appeals from a District Court judgment upholding a Department of Transportation ("DOT") rule that implements portions of the Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. § 12101 *et seq.* (1994). Appellant challenges those portions of the rule that authorize the imposition of money damages against bus companies that fail to comply with the ADA. Appellant claims that the remedies enumerated in the ADA are exclusive, and may not be supplemented with a money-damages scheme. It also alleges that DOT violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1994), because it provided neither notice that it was considering authorizing monetary relief nor opportunity for the public to comment.

We conclude that DOT lacked the statutory authority to impose money damages on bus companies. Congress has given the agency no authority to establish remedies in addition to those that are specified in the ADA. Because we hold that DOT exceeded the scope of its authority, we need not reach Appellant's notice-and-comment claim.

## I. BACKGROUND

### A. Factual background

Title III of the ADA generally requires operators of public accommodations, including common carriers, to make their services accessible to disabled persons. *See* 42 U.S.C. §§ 12181–88 (1994). Toward that end, the ADA instructs the Secretary of Transportation—which post is presently held by Appellee Rodney E. Slater—to promulgate rules concerning the accessibility of over-the-road buses ("OTRBs"), which are large motorcoaches designed for travel between cities. *See id.* § 12186(a). On September 6, 1991, DOT issued a set of interim rules governing OTRB accessibility. These rules required bus companies to provide boarding assistance to disabled passengers, and permitted operators to require passengers who needed such assistance to provide them with 48 hours of advance notice. DOT did not, at the time, oblige operators to equip their OTRBs with wheelchair lifts, nor did it require operators to pay money damages to disabled persons whose travel plans were frustrated. *See* Transportation for Individuals with Disabilities, 56 Fed. Reg. 45,584, 45,640 (1991).

In 1993, DOT issued an advance notice of proposed rulemaking in which the agency identified the OTRB-accessibility issues it hoped to resolve. Among DOT's concerns were whether *all* OTRB routes should have accessibility requirements, and whether disabled passengers' needs could be accommodated by an "on-call" system under which they could request an accessible OTRB in advance. *See* Transportation for Individuals with Disabilities; Accessibility of Over-the-Road Buses, 58 Fed. Reg. 52,735, 52,738–39 (1993). The public more than complied with the agen-

cy's request for comments: hundreds were submitted, mostly from disabled persons' advocacy groups and organizations representing the bus industry.

On March 25, 1998, DOT published a notice of proposed rulemaking ("NPRM") that proposed requiring all fixed-route OTRBs (regularly scheduled buses, such as Greyhound) to install wheelchair lifts, and obliging charter/tour OTRBs to provide lift-equipped buses to passengers who request them 48 hours in advance. The NPRM made no mention of the possibility of money damages, or any other scheme to compensate disabled passengers whose travel plans were frustrated by an inaccessible OTRB. *See* Transportation for Individuals with Disabilities, 63 Fed. Reg. 14,560–71 (1998).

After considering the over 400 comments submitted in response to its NPRM, the agency issued its final rule on September 28, 1998. Several commentators had urged DOT to promulgate an "on-call," or reservation-based, rule, under which all OTRB operators (and not just charter/tour operators) would be required to provide wheelchair-accessible buses to passengers who gave 48-hours advance notice of their need. *See, e.g.,* Comments of Coach USA, Inc. at 19–21. The agency rejected that alternative. Its final rule essentially imposed the obligations proposed in the NPRM—requiring fixed-route OTRB operators to equip their entire fleets with wheelchair lifts—with the additional requirement that bus companies pay "compensation" to disabled passengers when they fail to provide them with accessible service. A bus operator will be assessed a $300 fine for its first violation, $400 for its second, and so on in $100 increments up to $700 for its fifth and all subsequent infractions. *See* Transportation for Individuals with Disabilities, 63 Fed. Reg. 51,670, 51,692 (1998) (codified at 49 C.F.R. § 37.199 (2000)).

B. The District Court decision

Two days after the final rule was promulgated, September 30, 1998, Appellant American Bus Association filed a complaint in the United States District Court for the District of Columbia. ABA, an organization representing the bus industry, alleged, among other things, that DOT had no statutory authority to implement the money-damages scheme, that the agency had not provided adequate notice that it intended to adopt a remedies provision, and that the rule violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (1994).

On the parties' cross-motions for summary judgment, the District Court rejected each of ABA's contentions. The court found that the agency had provided adequate notice that it was considering a money-damages provision. While the NPRM may not expressly have mentioned the possibility of money damages, the remedies scheme was the "logical outgrowth" of the agency's often-expressed concern that bus companies would fail to provide accessible service to disabled passengers. *See American Bus Ass'n v. Slater,* No. 98–2351, Mem. Op. at 22–23, 1999 WL 986849 (D.D.C. Sept. 10, 1999) ("Mem. Op.") (citing, *inter alia, United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir. 1980) ("Where the change between the proposed and final rule is important, the question for the court is whether the final rule is a 'logical outgrowth' of the rulemaking proceeding.")). Indeed, the court reasoned, ABA had *actual* notice that DOT was considering a damages provision, as its own submitted comment expressly endorsed a proposal that disappointed passengers should be permitted to seek monetary relief. *See id.* at 25–26.

ABA's argument that the agency exceeded its statutory authority by imposing money damages fared no better. The District Court cited the Supreme Court's pronouncement that, if an authorizing "statute is silent or ambiguous," courts must uphold "a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A. Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837, 843, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Such an ambiguity, the court reasoned, exists here: "The plain language [of the ADA] indicates that Congress did not explicitly forbid the Secretary from including a compensation mechanism in the OTRB accessibility regulations." Mem. Op. at 28. Because of the ADA's silence on the availability of money damages—because "[a] gap exists in this enabling statute," *id.*— the court concluded that *Chevron* obliged it to defer to DOT's reasonable interpretation.

Nor was the District Court persuaded by ABA's argument that the agency's money-damages scheme is foreclosed by APA § 558(b), which establishes that "[a] sanction may not be imposed ... except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. § 558(b) (1994). The court conceded that DOT had authorized sanctions, but it reasoned that they were not *penal* sanctions. Because the sanctions were designed to remedy the injuries suffered by disabled persons whose travel needs were not accommodated, and because the fines would be paid directly to the disappointed passengers, "this court concludes that the provision is a regulatory sanction with a remedial purpose and not a penalty." Mem. Op. at 27. The court therefore entered summary judgment in favor of the agency's Secretary.

This appeal followed. ABA no longer contests DOT's decision to require that OTRB companies equip their buses with wheelchair lifts, and only its money-damages and notice-and-comment claims are before this Court.

## II.  DISCUSSION

### A.  *Chevron* and ADA § 12188

■ The principal issue in this case is whether DOT had the statutory authority to adopt a rule imposing money damages on bus companies that fail to provide accessible service to disabled passengers. Because, DOT proposes, this case involves a dispute as to whether that rule is in fact authorized by the statute it purports to implement, it is governed by the familiar two-step analysis announced in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "First, always," the reviewing court must consider "whether Congress has directly spoken to the precise question at issue." An affirmative answer "is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," the court must uphold "a reasonable interpretation made by the administrator of an agency." *Id.* at 843, 844, 104 S.Ct. 2778.

Applying *Chevron* to this case, we conclude that Congress unambiguously intended to preclude DOT from authorizing money damages. The ADA's carefully crafted remedies scheme reveals the legislature's intent that the statute's enumerated remedies were to be exclusive, and consequent intent to deny agencies the power to authorize supplementary monetary relief. The relevant portion of the ADA establishes that:

> The remedies and procedures set forth in section 2000a–3(a) of this title are *the remedies and procedures* this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title.

42 U.S.C. § 12188(a)(1) (emphasis added).

By preceding the words "remedies and procedures" with the definite article "the," as opposed to the more general "a" or "an," Congress made clear that it understood § 2000a–3(a)'s remedies to be exclusive. Indeed, "[i]t is a rule of law well established that the definite article 'the'

particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Brooks v. Zabka,* 168 Colo. 265, 450 P.2d 653, 655 (1969) (en banc); *see also* BLACK'S LAW DICTIONARY 1477 (6th ed. 1990) ("In construing statute, definite article 'the' particularizes the subject which it precedes and is word of limitation as opposed to indefinite or generalizing force 'a' or 'an'."). If Congress had intended those remedies not to be exclusive, it would have provided that the relief available to an ADA plaintiff *"includes"* the 2000a–3(a) remedies.

The remedies set forth in 42 U.S.C. 2000a–3(a)—which is part of the 1964 Civil Rights Act—do not include money damages. *See Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) ("When a plaintiff brings an action under that Title, he cannot recover damages."). Instead, as that subsection's caption ("Civil actions for injunctive relief") indicates, a party may invoke § 2000a–3(a) only in an effort to obtain "preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order." 42 U.S.C. § 2000a–3(a). As the Supreme Court has explained, a § 2000a–3(a) plaintiff primarily seeks·not redress of his own injury, but to vindicate the policy of the United States government. *See Newman,* 390 U.S. at 402, 88 S.Ct. 964 ("If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority.").

■ DOT additionally attempts to locate its authority to impose fines in the ADA's specification that the Attorney General may bring a civil action for money damages against OTRB operators that fail to provide accessible service. *See* 42 U.S.C. § 12188(b) (1994). "Congress contemplated," the agency submits, "that some type of compensation might be paid from an operator to a disappointed rider." Appel-

lee's brief at 54. Not only does the civil-action provision not assist DOT's claim that the ADA empowers it to authorize monetary relief, it actually undermines it. Congress did indeed contemplate that money damages would be available—but it also specified the precise conditions under which they could be paid. The monetary relief must be (1) awarded by a court (2) in a civil action (3) that was brought by the Attorney General. By specifying the circumstances under which monetary relief will be available, Congress evinced its intent that damages would be available in no others. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (recognizing that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it").

DOT's rule satisfies none of those three conditions. First, the agency itself, not an Article III court, presumably would levy fines against OTRB companies. Second, and as a consequence, the fines would not be assessed in a civil action. Finally, DOT makes monetary relief available even absent the participation of the Attorney General. In fact, the agency is somewhat, and perhaps deliberately, vague as to how it will enforce its sanctions: The parties dispute whether a disappointed passenger would hold a judicially cognizable right to compensation. *Compare* Appellant's brief at 25 n.16, 26 n.17, *with* Appellee's brief at 54–55 n.10. And at one point in its briefs—though not, crucially, in the rule itself—the agency claims that the Attorney General would be responsible for enforcement. *See* Appellee's brief at 54–55 n.10. But it is difficult to see how that could be the case, since DOT's rule describes the compensation procedure as involving "a sum sent *directly* to the passenger whose travel plans were disrupted," and indeed states that "[n]o administrative procedure"—or, presumably, judicial procedure—"is needed." Transportation for In-

dividuals with Disabilities, 63 Fed. Reg. 51,670, 51,687 (1998) (emphasis added).[1]

We conclude, therefore, that Congress has not granted DOT the power to impose money damages on bus companies that fail to provide accessible service to disabled passengers. We need not evaluate the reasonableness of the agency's rule under *Chevron*'s second step, since we are bound in the first instance to "give effect" to Congress's "unambiguously expressed intent." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

### B. APA § 558(b)

■ Our conclusion that DOT lacks the authority to authorize money damages is confirmed by the Administrative Procedure Act, § 558(b) of which establishes that "[a] sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. § 558(b) (1994). There is no dispute in this case that DOT's fines are sanctions; the District Court held as much, and the agency does not appear to challenge that finding. Instead, the District Court apparently concluded that § 558(b) requires express grants of statutory authority, not for all sanctions, but only for the ones that can be characterized as "penal." And, the court submitted, the OTRB rules do not impose a "penalty" inasmuch as they impose "a regulatory sanction with a remedial purpose." Memorandum Opinion at 27.

■ That conclusion is likely erroneous for two reasons. First, § 558(b) requires statutory authority for *all* sanctions, not merely those that can be characterized as penal. Second, DOT's compensation rule *does,* in fact, impose penalties that go beyond simple compensation. DOT's efforts to distinguish simple sanctions (which, it submits, may be imposed without an express authorization) from punitive sanc-

tions (which may not) rest on the following syllogism:

(1) Section 558(b) permits agencies to impose nonpunitive sanctions, even in the absence of express statutory authority.

(2) DOT's sanctions are non-punitive.

(3) Therefore, DOT could impose the sanctions absent express statutory authority.

The problem with the syllogism is that its major premise is flawed. Section 558(b) does not distinguish on its face between punitive sanctions and ordinary sanctions. It speaks of "sanctions," period, and provides no basis for supposing that one type may be imposed without statutory authorization, but that other types may not. Nor does DOT cite any cases that distinguish between punitive and ordinary sanctions. It simply moves from its conclusion that its rule imposes a sanction to drawing a distinction between the two types, and omits the necessary middle step of explaining why that distinction has any legal significance.

Nor is the syllogism's minor premise—that the agency's sanctions are non-punitive—persuasive. The amounts which bus companies will be made to pay are not a function of a would-be passenger's injury, but of the number of times the company has violated the ADA in the past. The fines begin at $300, for an OTRB operator's first offense, and escalate in increments of $100 up to $700, for an operator's fifth and all subsequent offenses. *See* Transportation for Individuals with Disabilities, 63 Fed. Reg. 51,670, 51,692 (1998) (codified at 49 C.F.R. § 37.199 (2000)). There is no connection between the fine imposed and the injury suffered. The fines are unrelated to the out-of-pocket expenses—which might include lodging, meals, and alternative transportation—a disappointed passenger could be expected to pay. Instead, the agency is concerned

---

1. If the Secretary intends to assert that by means of his rule he can channel the choices of the Attorney General and the courts within the ADA remedy structure, he points to nothing suggesting such authority.

principally with punishing noncomplying OTRB operators.

To be sure, the agency's sanctions may have several objectives, one of which is to punish and another of which is to remedy disabled persons' injuries. But this Court regards as a penalty any sanction that "goes *beyond* remedying the damage caused to the harmed parties by the defendant's action." *Johnson v. SEC*, 87 F.3d 484, 488 (D.C.Cir.1996) (emphasis added). In other words, a sanction is a penalty even if only one of its various objectives is to punish wrongful conduct; that is, if it "serv[es] *in part* to punish." *Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (emphasis added). Beyond cavil, DOT's sanctions are at least in part designed to punish, which is why the damages an OTRB operator must pay turn on the number of violations it has committed and not the extent of the disappointed passenger's injury.

Nor are we persuaded by DOT's attempt to circumvent § 558(b)'s directive by claiming that agencies possess a limited, but inherent, power to impose sanctions. DOT cites both *Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir.1979), and *Checkosky v. SEC*, 23 F.3d 452 (D.C.Cir.1994), for the proposition that an agency's general power to protect the integrity of its administrative processes entails an inherent sanctioning power. Both cases are easily dismissed or distinguished.

*Touche Ross* concerned a Securities and Exchange Commission rule that enabled the SEC to discipline attorneys by refusing to allow them to practice before it. The Second Circuit concluded that an agency has a limited power to impose sanctions that are not expressly authorized by statute, but only ones designed to "protect the integrity of its own processes." *Touche Ross*, 609 F.2d at 582. The Commission's disciplinary rule did not apply to the primary conduct of regulated entities, but was simply designed to "ensure that those professionals, on whom the Commission relies heavily in the performance of its

statutory duties, perform their tasks diligently and with a reasonable degree of competence." *Id.* The SEC's housekeeping-type rule is quite unlike the rule promulgated by DOT here, which penalizes regulated parties for violations of their statutory duties. The agency's authorization of monetary relief is not designed to "protect the integrity of its own processes," but to encourage OTRB companies to modify their primary conduct.

DOT's reliance on our own decision in *Checkosky* is even more easily dismissed. The portion of *Checkosky* on which the agency relies did not command a majority of this Court but is, instead, the separate opinion of a single Judge. *See* Appellee's brief at 55 (citing *Checkosky*, 23 F.3d at 455 (separate opinion of Silberman, J.)). And even if the *Checkosky* opinion did bind us, it would be distinguishable on the same grounds as *Touche Ross*: Like *Touche Ross*, that case concerned the SEC's authority to promulgate an internal disciplinary rule. DOT's inherent sanctioning power extends only to "protect[ing] the integrity of the agency's administrative processes," *Checkosky*, 23 F.3d at 455 (separate opinion of Silberman, J.), and not to modifying regulated parties' primary conduct.

We conclude, therefore, that DOT lacked the statutory authority to require OTRB companies to pay money damages to the disabled passengers whom they fail to accommodate. Congress could not speak more clearly than it has in the text of the APA: "a sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. § 558(b).

## C. Notice-and-comment

ABA additionally claims that DOT violated the APA by failing to provide it with adequate notice that it was considering, and with the opportunity to comment on, its money–damages rule. *See* 5 U.S.C.

§ 553(b), (c) (1994). Because we hold that DOT had no authority to promulgate that rule in the first instance, the Court finds it unnecessary to take up ABA's notice-and-comment claim. The agency has exceeded the scope of the authority delegated to it by Congress, and it matters not that they adhered to the APA's procedural requirements in doing so.

## III. CONCLUSION

Congress has not conferred on DOT the power to authorize money damages against OTRB companies that fail to comply with the ADA. We therefore reverse the District Court's grant of summary judgment in favor of the agency's Secretary.

*It is so ordered.*

SENTELLE, Circuit Judge, concurring:

I write separately to express my view that the Court need not reach the second step of *Chevron* for a more fundamental reason; namely, that the ADA contains no ambiguity that could trigger that analysis. DOT proposes as the statute's deference-triggering ambiguity the fact that the statute does not expressly state that the remedies detailed in § 12188 are to be "exclusive." In essence, the agency's position—and the District Court's holding— is that the absence of a statutory grant of power is itself an ambiguity that calls for *Chevron* deference. *See, e.g.*, Mem. Op. at 28 ("The plain language [of the ADA] indicates that Congress did not explicitly forbid the Secretary from including a compensation mechanism in the OTRB accessibility regulations."); Appellee's brief at 43 (proposing that the "first step of the *Chevron* analysis ... can be resolved quickly here" because Congress "neither required nor prohibited the Secretary from promulgating a compensation provision" and because "Congress did not place any specific limitations on the contents of the OTRB rules"). An agency, DOT submits, is free to impose *any* otherwise-reasonable rule that Congress has not expressly prohibited.

I would conclude that the second step of *Chevron* is not even implicated in this case. *Chevron* step two applies only when a statute contains an ambiguity. But Congress's failure to grant an agency a given power is not an ambiguity as to whether that power has, in fact, been granted. On the contrary, and as this Court persistently has recognized, a statutory silence on the granting of a power is a *denial* of that power to the agency. *See, e.g., Backcountry Against Dumps v. EPA,* 100 F.3d 147, 150 (D.C.Cir.1996) (rejecting EPA's argument "that, since section 6945(c) is silent as to its application to Indian tribes, the statute is 'ambiguous'"); *Ethyl Corp. v. EPA,* 51 F.3d 1053, 1060 (D.C.Cir.1995) ("We refuse, once again, to presume a delegation of power merely because Congress has not expressly withheld such power."); *see also Adams Fruit Co. v. Barrett,* 494 U.S. 638, 649, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) ("A 'gap' is not created in a statutory scheme merely because a statute does not restate the truism that States may not pre-empt federal law.").

This Court, while sitting *en banc*, has already disposed of DOT's argument that the judiciary must afford *Chevron* deference to an agency's interpretation of a statutory silence. "To suggest," we reasoned,

> that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in "thou shalt not" terms), is both flatly unfaithful to the principles of administrative law outlined above, and refuted by precedent.... Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.

*Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 671 (D.C.Cir.1994) (en banc) (emphasis in orig-

inal) (citations omitted). The ADA is not ambiguous on whether it grants DOT the power to authorize money damages against non-complying bus companies. The statute simply does not grant it that power.

The proposition that statutory silences are not *Chevron*-triggering ambiguities follows from the very nature of administrative agencies. Agencies have no inherent powers. They instead are creatures of statute, and may act only because, and only to the extent that, Congress affirmatively has delegated them the power to act. *See Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it."); *Railway Labor Executives' Ass'n,* 29 F.3d at 670 ("Agencies owe their capacity to act to the delegation of authority, either express or implied, from the legislature.").

Hence if Congress wishes to deny an agency a given power, it need not expressly restrict the agency; it is enough for Congress simply to decline to delegate power. In the same way, a statute that is completely silent on the question of whether it confers a power does not vest the agency with the discretion to determine the scope of that power. *See Natural Resources Defense Council v. Reilly,* 983 F.2d 259, 266 (D.C.Cir.1993) (" '[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron.*' " (quoting *Kansas City v. Dep't of Housing & Urban Dev.,* 923 F.2d 188, 191–92 (D.C.Cir.1991))). In order for there to be an ambiguous grant of power, there must be a grant of power in the first instance. There is none here.

Moreover, accepting DOT's contention—that a statutory silence empowers it to promulgate any rules that Congress has not expressly forbidden—would vest agencies with near-plenary authority. Agencies would become the nation's principal lawmakers. After all, it is the norm for statutes to be silent on whether they grant various powers to agencies. The ADA is silent on whether DOT has the power to oblige bus companies to give disabled persons free passage. It is also silent on whether DOT has the power to require that bus companies transport disabled passengers in their own individual buses. If we were to accept DOT's view, we would be obliged to conclude that Congress somehow, if only ambiguously, has authorized the agency to adopt both of those rules, and consequently would be bound to afford them *Chevron* deference. We would not, of course, be obliged to rubber-stamp an agency's interpretation of those, or any other, statutory silences; any such interpretation would still have to satisfy the reasonableness test of *Chevron* step two. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778 (requiring courts to uphold only "a reasonable interpretation made by the administrator of an agency"). But it makes a mockery of *Chevron* to suggest that its second prong is even implicated by Congress's failure to deny a power to an agency.

The agency's position—that that which is not forbidden is permitted—turns the basic assumption of the American system of government on its head. Our Constitution permits the national government to exercise only those powers affirmatively granted to it by the people of the several states. *See, e.g.,* U.S. Const. amend. X; *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 405, 4 L.Ed. 579 (1819) ("This government is acknowledged by all to be one of enumerated powers"); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written."). The Constitution's presumption is that a power not expressly conferred on the federal government has been denied to it. The same principle informs Congress's delegations of power to administrative agencies. Unless Congress delegates authority to an agency,

the agency is without power to act. And, it goes without saying, courts need not defer to an agency's interpretation, reasonable or otherwise, of a non-existent grant of power.