U.S. SECURITY, et al., Plaintiffs,

v.

FEDERAL TRADE COMMISSION, Defendant.

No. CIV–03–122–W.

United States District Court, W.D. Oklahoma.

Sept. 23, 2003.

Jon Epstein, Robert D. Nelson, Susanna M. Voegeli, Hall Estill–OKC, Oklahoma City, OK, Douglas Haber Green, John L. Moore, Jr., Thomas F. O'Neill, III, Emilio W. Cividanes, Piper Rudnick LLP–DC, Washington, DC, for Plaintiffs.

Lawrence DeMille–Wagman, Federal Trade Commission, Washington, DC, for Defendant.

## *ORDER*

LEE R. WEST, District Judge.

This matter comes before the Court on the Motion for Summary Judgment filed by plaintiffs U.S. Security, Chartered Benefit Services, Inc., Global Contact Services, Inc., InfoCision Management Corporation and Direct Marketing Association, Incorporated ("DMA"), and the Motion for Summary Judgment filed by defendant Federal Trade Commission ("FTC"). The parties have filed responses and replies, and the Court has carefully considered the record as a whole, and in so doing has limited its recitation of the facts, its citation to authority and its discussion of the issues to those that support its determination as to the issues involved.

1. All plaintiffs save DMA offer telemarketing services. DMA is a non-stock corporation organized as a non-profit trade association. It represents approximately 5000 companies from the United States.

2. The FTC is an independent government agency.

3. In 1991, the Telephone Consumer Protection Act ("TCPA"), 47 U.S. § 227, was enacted "to protect residential telephone subscribers' privacy rights to avoid telephone solicitations to which they object." *Id.* § 227(c)(1). To accomplish the purposes of the TCPA, the Federal Communications Commission ("FCC") was directed to promulgate regulations that restricted the use of automatic telephone dialing systems. *Id.* § 227(b)(1).

4. The TCPA expressly permitted the FCC to establish and operate "a single national database ... of telephone numbers of residential subscribers who object to receiving telephone solicitations ...." *Id.* § 227(c)(3).

5. In 1992, the FCC adopted rules pursuant to the TCPA, but declined to create a national "do-not-call" list. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* (October 16, 1992) at 9, ¶ 14.

6. The FCC determined that such a list would not assist telephone subscribers who "by and large would like to maintain their ability to choose among those telemarketers from whom they do and do not want to hear." *Id.* at 10, ¶ 15 (footnote omitted). The FCC further determined that registered consumers "would still receive calls from exempted businesses or organizations," *id.* at 7–8, ¶ 12 (footnote and citation omitted), and therefore, "[i]n view of the many drawbacks of a national do-not-call database, and in light of the existence of an effective alternative (company-specific do-not-call lists)," *id.* at 10, ¶ 15, that a nationwide do-not-call list was "not an efficient, effective, or economic means of avoiding unwanted telephone solicitations." *Id.*

7. The FCC instead required telemarketers to adopt company-specific do-not-call lists, and a consumer who did not wish to receive telephone solicitations from a particular company could request that the telemarketer remove that consumer's telephone number from the telemarketer's list.

8. In 2002, the FCC issued a Notice of Proposed Rulemaking requesting comment on amendments to those rules it had adopted pursuant to, and which implemented, the TCPA. Comment was requested on inter alia whether the FCC should revisit its decision regarding the establishment of a national do-not-call list and whether the FCC should refine those rules promulgated under the TCPA that regulated the use of predictive dialers.

9. "A predictive dialer is an automatic dialing software program that ... automatically dials consumers' telephone numbers in a predetermined manner and at a predetermined time such that the consumer will answer the phone at the same time that telemarketer is free to take the call. These software programs are set up to predict when a telemarketer will be free to take the next call, in order to minimize the amount of downtime for the telemarketer. In some instances, however, when a consumer answers the phone, there is no telemarketer free to take the call. In those instances, the predictive dialer disconnects the call and the consumer either hears nothing ('dead air') or hears a click as the dialer hangs up." 67 Fed.Reg. 4522.

10. In 1994, three years after the enactment of the TCPA, Congress enacted the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAP"), 15 U.S.C. §§ 6101–6108. This legislation directed the FTC to "prescribe rules prohibiting deceptive ... and other abusive telemarketing acts or practices," *id.* § 6102(a)(1), and to "include in such rules ... a definition of deceptive telemarketing acts or practices ...." *Id.* § 6102(a)(2).

11. In particular, the TCFAP required the FTC to promulgate rules (1) that pre-

vented telemarketers from "undertak[ing] a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy," *id.* § 6102(a)(3)(A), (2) that restricted "the hours of the day and night when unsolicited telephone calls can be made to consumers," *id.* § 6102(a)(3)(B), and that required telemarketers engaged in the sale of goods and services to "promptly and clearly disclose ... that the purpose of the call is to sell goods or services and make such other [appropriate] disclosures ...." *Id.* § 6102(a)(3)(C).

12. By its terms and because the TCFAP is to be enforced by the FTC, the TCFAP does not apply to activities that are outside of the jurisdiction of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41–45. 15 U.S.C. § 6105(a). The FTC Act does not apply to inter alia certain financial institutions, common carriers, air carriers and nonprofit organizations or to insurance companies to the extent that such the business of insurance is regulated by state law, and the telemarketing activities conducted by these exempted organizations and entities are therefore not subject to the rules promulgated by the FTC under the TCFAP.

13. In August 1995, the FTC promulgated the Telemarketing Sales Rule ("TSR") to implement the TCFAP. The TSR included inter alia regulations designed to effectuate the TCFAP's stated purpose of prohibiting telemarketers from "undertak[ing] a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy." 15 U.S.C. § 6102(a)(3)(A).

14. These regulations also described the conduct which constituted an abusive telemarketing act or practice: (1) "[c]ausing any telephone to ring, or engaging any person in a telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number," 16 C.F.R. § 310.4(b)(1)(i), or (2) "[i]nitiating an outbound telephone call to a person when that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered." *Id.* § 310.4(b)(1)(iii).

15. On January 30, 2002, the FTC issued a Notice of Proposed Rulemaking that recommended a series of amendments to the TSR. The proposed changes, upon which comment was sought,[1] (1) included the creation of a national do-not-call registry, to be maintained by the FTC, 67 Fed.Reg. 4516–4521; (2) addressed the problem of "abandoned calls" resulting from the use of predictive dialers by telemarketers, *id.* at 4522–4524; and (3) addressed the issue of preacquired account telemarketing and the use by telemarketers of "preacquired billing information." *Id.* at 4512–4514.

16. On January 29, 2003, the FTC promulgated the amendments to the TSR. The TSR, as amended ("Final Amended Rule"), 68 Fed.Reg. 4580 (January 29, 2003), inter alia established a nationwide do-not-call registry and specified requirements for the use of predictive dialers. It also restricted telemarketers' use of preacquired account information, which was defined in the Final Amended Rule as "any information that enables a ... telemarketer to cause a charge to be placed against a customer's ... account without obtaining the account number directly from the customer ... during the telemarketing trans-

---

1. The FTC received more than 64,000 comments In response to the Notice of Proposed Rulemaking. 68 Fed.Reg. 4582. It also conducted a three-day public forum in June 2002 at which interested parties presented argument.

action pursuant to which the account will be charged." *Id.* at 4670.

17. The Final Amended Rule "[s]upplement[ed] the current company-specific 'do-not-call' provision with a provision that will empower a consumer to stop calls from all companies within the FTC's jurisdiction by placing his or her telephone number on a central 'do-not-call' registry maintained by the FTC, except when the consumer has a 'established business relationship' with the seller on whose behalf the call is made ...." *Id.* at 4583.

18. The Final Amended Rule also "[e]xplicitly exempt[ed] solicitations to induce charitable contributions via outbound telephone calls from coverage ...," *id.,* and as indicated, does not extend to those entities outside of the FTC Act and thus, outside of the FTC's jurisdiction.

19. The Final Amended Rule also declared abandoning any outbound telephone call an "abusive telemarketing act or practice," *id.* at 4672, and deemed "[a]n outbound telephone call ... 'abandoned' if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting." *Id.*

20. The Final Amended Rule exempted from liability those telemarketers that "employ[ ] technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured per day per calling campaign." *Id.* at 4673.

21. This "safe harbor" also included three other requirements: (1) the telemarketer must "allow[ ] the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call," *id.;* (2) "whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the ... telemarketer [must] promptly play[ ] a recorded message that states the name and telephone number of the seller on whose behalf the call was placed," *id.* (footnote omitted); and (3) the telemarketer must retain records establishing compliance with the other elements of the "safe harbor" standard. *Id.*

22. The Final Amended Rule required in any telemarketing transaction involving preacquired account information and a "free-to-pay conversion" feature,[2] the telemarketer not only must obtain from the customer, at a minimum, the last four (4) digits of the account number to be charged and his or her express agreement to be charged but also must make and maintain an audio recording of the entire telemarketing transaction. *Id.* at 4672.

The plaintiffs have brought the instant suit to challenge the Final Amended Rule's creation of a national do-not-call registry, its prohibition of abandoned calls and its restriction on the use of preacquired account information. Specifically, the plaintiffs have asked the Court to vacate, set aside and enjoin the FTC from enforcing the provisions of the Final Amended Rule that establish the national do-not-call registry (to be codified at 16 C.F.R. § 310.4(b)(1)(iii)(B)), that limit the abandonment of telemarketing calls (and thus, allegedly regulate the use of predictive dialers) (to be codified at *id.* § 310.4(b)(1)(iv); *id.* § 310.4(b)(4)), and that define the term "preacquired account information" (to be codified at *id.*

---

**2.** "Free-to-pay conversion means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the produce or service if he or she does not take affirmative action to cancel before the end of that period." 68 Fed.Reg. 4669.

§ 310.2(w)), and regulate the use of such information (to be codified at *id.* § 310.4(a)(6)).

■ In those cases involving questions concerning an agency's construction of a statute it administers, the United States Supreme Court has stated that "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)(footnote omitted). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnote omitted); *e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)(reviewing court must respect agency's construction of statute so long as it is permissible). This "deference is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones.'" 529 U.S. at 132, 120 S.Ct. 1291 (quoting *Chevron*, 467 U.S. at 866, 104 S.Ct. 2778).

"'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. at 843–44, 104 S.Ct. 2778 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct.

1055, 39 L.Ed.2d 270 (1974))(footnote omitted). If "the legislative delegation to an agency on a particular question is implicit ... [,][i]n such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the ... agency." *Id.* at 844, 104 S.Ct. 2778 (footnote omitted).

■ The United States Court of Appeals for the Tenth Circuit has held, however, that "deference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1231 (10th Cir.1999) (citations omitted). The circuit court has stated that "[w]hen faced with a statutory interpretation that 'would raise serious constitutional problems, the [c]ourt[s] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Id.*

■ The plaintiffs have first argued that the FTC's interpretation of the TCFAP to promulgate a rule establishing a national do-not-call registry, without an unambiguous grant of authority by Congress to do so, "presents a serious or grave constitutional question," *id.*, and thus, the FTC's actions are entitled to no deference. In support of this contention, the plaintiffs have argued that the Final Amended Rule as it pertains to the national do-not-call registry violates their rights under the first and fifth amendments to the United States Constitution because it discriminates against speech based upon content and identity of speakers and because it suppresses far more speech than necessary.

The basic, and what the Court considers to be the dispositive, issue raised by the plaintiffs as to its first challenge to the Final Amended Rule is whether the FTC had the authority to promulgate a national

do-not-call registry. The Court finds it did not.

Congress expressly granted the authority to the FCC under the TCPA to establish and operate "a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations . . . ." 47 U.S.C. § 227(c)(3). It charged the FTC under the TCFAP with the authority to "prohibit[ ] deceptive . . . and other abusive telemarketing acts or practices," 15 U.S.C. § 6102(a)(1), because Congress was concerned that "[i]nterstate telemarketing fraud ha[d] become a problem . . . ." *Id.* § 6101(2).

The FTC has relied upon three sources to support its assertion of jurisdiction to promulgate a do-not-call registry: the TCFAP itself, the fact "that this is an era of overlapping agency jurisdiction under different statutory mandates," *FTC v. Texaco, Inc.,* 555 F.2d 862, 881 (D.C.Cir.1977), and post-promulgation enactments.

The FTC has conceded that the TCFAP is silent as to the FTC's authority to promulgate a do-not-call registry, but has argued that because the FTC has declared that any telemarketing call to a number on a do-not-call registry would be abusive, creation of such a registry is therefore permitted pursuant to its statutory authority to regulate abusive telemarketing acts or practices. "Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity [or silence] constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Brown & Williamson,* 529 U.S. at 159, 120 S.Ct. 1291 (citing *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778). The Court finds no delegation to the FTC in this case.

The Court further finds unpersuasive the FTC's argument that aspects of the economy may be regulated by more than one agency as well as the FCC's argument that congressional silence may itself create an ambiguity that calls for *Chevron* deference. The FTC's first argument presupposes that each agency was granted the authority to act by Congress.

As to the FTC's second argument, the express grant of authority to the FCC to promulgate a do-not-call registry, together with the complete silence on the subject in the TCFAP, makes "plain that Congress has not given the [FTC] the authority that it seeks to exercise here." 529 U.S. at 161, 120 S.Ct. 1291; *e.g., id.* at 160, 120 S.Ct. 1291 ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."). Indeed, congressional "silence cannot be read as ambiguity resulting in delegated authority . . . to promulgate the disputed regulation[ ]." *Motion Picture Association of America, Inc. v. FCC,* 309 F.3d 796, 806 (D.C.Cir.2002). Moreover, "Congress' failure to grant an agency a given power is not an ambiguity as to whether that power has, in fact, been granted. . . . [A] statutory silence on the granting of a power is a denial of that power to the agency." *American Bus Association v. Slater,* 231 F.3d 1, 8 (D.C.Cir.2000)(Sentelle, J., concurring)(emphasis deleted) (citations omitted).

█ Finally, in attempting to justify its promulgation of the do-not-call registry, the FTC has relied upon post-promulgation appropriations legislation. In particular, the FTC has relied upon the Consolidated Appropriations Resolution, P.L. 108–7 (February 20, 2003), and the Do–Not–Call Implementation Act, P.L. 108–10 (March 11, 2003). The former authorizes the FTC to use, as part of its funding, a certain amount derived from "fees sufficient to implement and enforce the do-not-call provisions of the Telemarketing Sales Rule, . . . promulgated under the [TCFAP]

.... " The latter authorizes the FTC "to collect fees for the implementation and enforcement of a 'do-not-call' registry, and for other purposes."

"Congress may ... do by ratification what it might have authorized. And ratification may be effected through appropriation acts. But the appropriation must plainly show a purpose to bestow the precise authority which is claimed." *Ex Parte Mitsuye Endo*, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 89 L.Ed. 243 (1944) (citations omitted). The legislation upon which the FTC has relied does not unequivocally grant the FTC the authority under the TCFAP to promulgate a do-not-call registry. It merely recognizes that the FTC has done so.

The Court finds its decision is further supported by the doctrine of in pari materia. Statutes such as the TCPA and the TCFAP are considered to be in pari materia since they relate to the same subject, and "[i]t is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter." N. Singer, 2B *Sutherland Statutory Construction* § 51.02, at 121 (5th ed.1992)(footnote omitted). "[T]he new provision is presumed in accord with the legislative policy embodied in those prior statutes," *id.* (footnote omitted), and "[t]hus, they all should be construed together." *Id.* (footnote omitted).

A second principle of statutory construction, which the Court also finds applicable, holds that " 'where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.' " *Id.* at 122.

Admittedly, the elimination of telemarketing fraud and the prohibition against deceptive and abusive telemarketing acts or practices are significant public concerns; however, "an administrative agen-cy's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." 529 U.S. at 161, 120 S.Ct. 1291. Absent such a grant of authority in this case, the Court finds the do-not-call provision to be invalid.

■ As stated, the plaintiffs have also challenged the FTC's restrictions on abandoned calls. They have contended that the FCC's express congressional grant of authority under the TCPA to regulate automated telephone dialing systems precludes, and renders ultra vires, any regulation by the FTC that would affect the technology used by telemarketers.

As the FTC has admitted, there is no similar express grant of authority to the FTC under the TCFAP to regulate predictive dialers. The FTC has however been directly charged by Congress to promulgate rules to eliminate abusive telemarketing acts or practices, 15 U.S.C. § 1602(a), and to prohibit telemarketers from "undertak[ing] a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right of privacy." *Id.* § 1602(a)(3)(A). The Final Amended Rule's restriction on abandoned calls is a permissible regulation of this most (and undisputedly) invasive and abusive practice, and its promulgation, which is in no way hindered or hobbled by the FCC's grant of authority, has carried into effect congressional intent as expressed by the TCFAP. *E.g., Sundance Associates, Inc. v. Reno*, 139 F.3d 804, 808 (10th Cir.1998).

■ The plaintiffs have also challenged the FTC's restrictions on the use of preacquired account information and have contended that the FTC is impermissibly augmenting its authority to regulate "unfair" practices under the FTC Act by using that standard as the basis for regulating preacquired account information under the TCFAP, without adhering to the strict

statutorily-imposed procedures for declaring a practice "unfair" under the FTC Act, 15 U.S.C. §§ 45(n), 57a. The FTC has responded that it has been charged by Congress to promulgate rules to prohibit "abusive telemarketing acts or practices," 15 U.S.C. § 6102(a)(1), and that its interpretation of the term "abusive" in this context should be given deference under *Chevron.*

The Final Amended Rule seeks to eliminate unauthorized charges on a customer's account, a practice the FTC has deemed "abusive." The fact that this practice also fits within the definition of an "unfair" act or practice of the FTC Act, 15 U.S. § 45(n) (unfair "act or practice causes or· is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves, and not outweighed by countervailing benefits"); *see* 68 Fed.Reg. 4620 & n. 464, does not render the FTC's interpretation of the term "abusive" unreasonable. *E.g., Universal Construction Co. v. Occupational Safety and Health Review Commission,* 182 F.3d 726, 729 (10th Cir.1999)(interpretation must be based on permissible construction of, and not frustrate policy underlying, statute).

The plaintiffs have also challenged the Final Amended Rule's regulation of preacquired account information on the grounds the FTC promulgated this regulation in violation of the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. §§ 553(b), (c). In particular, the plaintiffs have argued that certain entities and individuals, who believed, based upon the language of the proposed rule, that they would not be (but now are) subject to the Final Amended Rule, were deprived of their right to notice and an opportunity to comment on this provision of the Final Amended Rule.

"The rulemaking process requires an agency 'to fairly apprise interested parties of all significant subjects and issues involved,' so that they can participate in the process. This policy is not undermined when an agency promulgates a final rule that does not mirror precisely the proposed rule outlined in the notice. A 'substantially different' rule is permissible as long as the participants had sufficient notice at the start of the process." *Fertilizer Institute v. Browner,* 163 F.3d 774, 779 (3d Cir.1998)(quoting *American Iron & Steel Institute v. EPA,* 568 F.2d 284, 291 (3d Cir.1977))(other citations omitted).

The Court has considered the allegedly "marked departures" between the proposed rule and the admittedly broader Final Amended Rule about which the plaintiffs have complained and in doing so, finds the relief requested by the plaintiffs is not warranted.

■ As case law demonstrates, "notice requirements do not require that the final rule be an exact replication of the proposed rule." *Association of Battery Recyclers, Inc. v. EPA,* 208 F.3d 1047, 1058 (D.C.Cir.2000). "[N]otice and comment requirements are met when an agency issues rules 'that do not exactly coincide with the proposed rule so long as the final rule is the 'logical outgrowth' of the proposed rule.'" *Id.* at 1058–59 (quoting *Fertilizer Institute v. EPA,* 935 F.2d 1303, 1311 (D.C.Cir.1991)).

A review of the record indicates that the FTC gave fair notice "'of all significant subjects and issues involved.'" 163 F.3d at 779 (quoting *American Iron & Steel Institute v. EPA,* 568 F.2d 284, 291 (3d Cir.1977)). Because the policies underlying the notice requirements have been served in this case and because the Final Amended Rule as it pertains to the use of preacquired account information is a logical outgrowth of the proposed rule, the Court finds the plaintiffs' challenges must fall.

Based upon the foregoing, the Court

(1) GRANTS the plaintiffs' Motion for Summary Judgment filed on April 22, 2003, to the extent that the plaintiffs have challenged the do-not-call registry and DENIES said motion as to all other challenges to the Final Amended Rule;

(2) DENIES the FTC's Cross–Motion for Summary Judgment filed on May 19, 2003, to the extent that the FTC has sought summary judgment in its favor as to that portion of the Final Amended Rule pertaining to the do-not-call registry and GRANTS said motion as to all other portions of the Final Amended Rule that have been challenged by the plaintiffs;

(3) DENIES the plaintiffs' Motion for Leave to File Affidavits filed on September 3, 2003; and

(4) ORDERS judgment to issue forthwith.

### JUDGMENT

Pursuant to the Order filed this date, the Court finds that judgment should be and is hereby entered as a matter of law in favor of the plaintiffs, U.S. Security, Chartered Benefit Services, Inc., Global Contact Services, Inc., InfoCision Management Corporation and Direct Marketing Association, Incorporated, on the plaintiffs' claims that that portion of the Final Amended Rule that pertains to the national do-not-call registry is invalid. The Court further finds that judgment should be and is hereby entered as a matter of law in favor of the defendant, Federal Trade Commission, on all remaining claims asserted by the plaintiffs.