The CITY OF KANSAS CITY, MISSOURI, Appellant,

v.

DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, et al.

No. 89–5385.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 12, 1990.

Decided Jan. 18, 1991.

Otto J. Hetzel, Washington, D.C., with whom Gaylord A. Virden was on the brief, for appellant.

Nathan Dodell, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., and Gershon M. Ratner, Washington, D.C., Associate Gen. Counsel for Dept. of Housing and Urban Development, were on the brief, for appellees.

Before EDWARDS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge D.H. GINSBURG.

HARRY T. EDWARDS, Circuit Judge:

The Urban Development Action Grant ("UDAG") program authorizes the Secretary of the Department of Housing and Urban Development ("HUD" or "the agency") to make grants to cities and urban counties experiencing "severe economic distress." 42 U.S.C. § 5318(a) (1988). In 1983, appellant City of Kansas City, Missouri ("Kansas City" or "the city") and appellee HUD executed an agreement under which the city would receive a $613,000 grant to assist in financing low-interest home ownership loans. Subsequently, when a dispute arose over the city's compliance with the terms of the grant agreement, HUD terminated the arrangement prior to final approval and before any funds had been disbursed. Kansas City challenges the agency action on two grounds: first, the city claims that, before acting to terminate the grant agreement, the agency was required to give notice and a hearing under section 111 of the Housing and Community Development Act of 1974

("HCDA" or "the Act"), 42 U.S.C. § 5311 (1988); second, the city contends that, in any event, the agency's action in terminating the grant agreement was arbitrary and capricious.

On the first claim advanced by the city, we find section 111 to be unclear with respect to the process required when grant agreements are terminated prior to payment. Because of this ambiguity in the statute, and because the Act implicitly delegates interpretive authority to HUD, we are constrained to defer to the agency's interpretation of the Act as long as it is "based on a permissible construction of the statute," *i.e.*, one that is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). On the record before us, however, we find that HUD has offered no reasoned interpretation of section 111 to which we can defer. Accordingly, we remand to the agency for initial consideration of the meaning of section 111 as it applies to the termination of Kansas City's UDAG agreement.

Even assuming, *arguendo*, that HUD had the authority under the Act to terminate the city's UDAG agreement without notice or hearing, we find merit in the city's claim that the action in this case was arbitrary and capricious. On the record before us, we can find no reasoned decision-making justifying HUD's termination of the UDAG grant to Kansas City. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983) ("an agency must cogently explain why it has exercised its discretion in a given manner"). Accordingly, because the agency has failed to provide a coherent explanation for its decision to terminate the grant agreement, we grant the petition for review and remand to HUD for reconsideration of its decision.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

Title I of the HCDA establishes a number of grant programs to assist in the development of viable urban communities and in the provision of housing for persons of low and moderate incomes. *See* 42 U.S.C. § 5301 (1988). In 1977, the UDAG program was added to Title I of the Act. *See* Pub.L. No. 95–128, § 110(b), 91 Stat. 1125 (codified as amended at 42 U.S.C. § 5318 (1988)). The UDAG program allows economically distressed cities and urban counties to apply and compete for grants intended to stimulate private economic development. *See* 42 U.S.C. § 5318(a)-(d).

Extensive HUD regulations govern the UDAG application process. *See* 24 C.F.R. Part 570, Subpart G (1990). The agency reviews all UDAG applications in accordance with specified selection criteria, awarding preliminary approval to those applications receiving the highest scores. *See* 24 C.F.R. § 570.459, 570.460 (1990). The terms and conditions of approval are finalized when HUD and the grant recipient execute a UDAG agreement. *See* 24 C.F.R. § 570.461(a) (1990). Included in each UDAG agreement is a schedule for submission by the grant recipient of certain evidentiary materials, including evidence of "legally binding commitments" from all parties participating in the project. *See* 24 C.F.R. § 570.461(b) (1990).

Final grant approval and actual disbursement of grant funds are conditioned on the submission and acceptance of these legally binding commitments. *See* 24 C.F.R. § 570.460(c)(5) (1990). Both the HUD regulations and HUD grant agreements explicitly provide that failure to submit legally binding commitments or other evidentiary materials by the specified date is grounds for termination. *See* 24 C.F.R. § 570.461(d) (1990); Grant Agreement, section 7.02(b), *reprinted in* Joint Appendix ("J.A.") II 13.

Neither the UDAG regulations nor the agreements themselves provide for any formal procedure prior to termination by HUD of UDAG agreements. However, section 111 of the Act, applicable by its terms to all Title I programs, entitles grant "recipient[s]" to notice and hearing before they are penalized for noncompliance. In relevant part, section 111 mandates:

If the Secretary finds *after reasonable notice and opportunity for hearing* that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary, until he is satisfied that there is no longer any such failure to comply, shall—

> (1) terminate payments to the recipient under this chapter, or
>
> (2) reduce payments to the recipient under this chapter by an amount equal to the amount of such payments which were not expended in accordance with this chapter, or
>
> (3) limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply.

42 U.S.C. § 5311(a) (1988) (emphasis added). HUD has promulgated regulations detailing the procedures to be followed when section 111 is invoked. *See* 24 C.F.R. § 570.913 (1990).

B. *The Proceedings Below*

In January 1983, Kansas City applied for a UDAG to assist in financing a housing development known as the Citadel Center Project. HUD preliminarily approved the grant application and, in September 1983, executed a UDAG agreement finalizing the terms and conditions under which Kansas City would receive a $613,000 grant. The project schedule established by the grant agreement required that Kansas City submit certain evidentiary materials by November 1, 1983. Grant Agreement, Exhibit F, *reprinted in* J.A. II 39.

In July 1984, when the city had not yet made its evidentiary submission, HUD issued a notice warning that the grant agreement would be terminated unless the required materials were submitted within 30 days of receipt of the notice. J.A. II 55. In response, Kansas City submitted some evidentiary materials in July and August 1984. J.A. II 56, 60. Subsequently, the final deadline for evidentiary submissions was extended to September 15, 1984, by amendment to the grant agreement. J.A. II 77.

When that deadline, too, had passed, HUD sent Kansas City a second notice warning of termination unless the city submitted the necessary evidentiary materials within 30 days of receipt of the notice. J.A. II 94 ("notice letter"). The notice was mailed by HUD on January 28, 1985, and received by Kansas City on February 1. *See* J.A. I 43. Kansas City made an evidentiary submission on March 4, 1985, a date which both parties now concede fell within the critical 30–day time period,[1] and HUD received the submission on March 5, 1985. *See* J.A. II 97. Nevertheless, by letter dated March 19, 1985, HUD terminated the Kansas City UDAG agreement on the grounds that no evidentiary materials had been submitted in response to its notice of January 28. J.A. II 95. A series of communications between various HUD and Kansas City officials ensued, at the close of which the agency agreed to reconsider its decision. On October 31, 1985, HUD sent the city a final letter, "serv[ing] to reaffirm that the action of the Department to terminate the grant award was appropriate and no basis exists for its reinstatement." J.A. II 246.

In July 1986, Kansas City filed suit in federal district court. The city claimed, first, that HUD's failure to accord it a hearing prior to termination of its UDAG agreement violated section 111 of the Act and, second, that the agency action terminating its agreement was arbitrary and capricious under the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 706 (1988). The District Court rejected both claims and awarded summary judgment to HUD. *City of Kansas City v. HUD*, Civ. Action No. 86–1954 (D.D.C. July 31, 1989), *reprinted in* J.A. I 351.

The District Court concluded that section 111 is inapplicable to cases in which HUD terminates a grant agreement before the

---

1. The 30–day deadline established by the HUD notice expired on Sunday, March 3, 1985. Kansas City submitted its evidentiary materials on Monday, March 4, 1985, the first working day after the lapse of the deadline. J.A. II 97. The agency does not now contest that the submission was in compliance with the HUD deadline.

grantee satisfies the conditions of its grant agreement and begins to receive payments. Accordingly, it denied Kansas City's motion for partial summary judgment on its statutory claim to notice and hearing. *See Kansas City*, slip op. at 12–13, *reprinted in* J.A. I 362–63. The District Court also ruled that the agency action was not arbitrary and capricious, resting its holding on a mistaken belief that the city did not respond in a timely manner to HUD's notice letter of January 1985. *See Kansas City*, slip op. at 9, *reprinted in* J.A. I 359.

Kansas City now appeals the District Court decision, reasserting before this court both its section 111 claim to notice and hearing and its separate APA claim of arbitrary and capricious agency action.

## II. ANALYSIS

### A. Statutory Authority (The Chevron Issue)

Kansas City's first contention is that HUD acted without statutory authority when it terminated the city's UDAG agreement. Section 111 of the HCDA authorizes HUD to "terminate payments," "reduce payments" or "limit the availability of payments" if a "recipient of assistance" is in substantial noncompliance with Title I, but only after "reasonable notice and opportunity for hearing." 42 U.S.C. § 5311(a)(1)–(3). Kansas City argues that HUD violated this statutory obligation when it failed to provide the city with opportunity for hearing before terminating its grant agreement. In response, HUD claims that section 111 does not apply to termination of a UDAG agreement *before* final approval and commencement of payments. Specifically, HUD argues that Kansas City never became a *"recipient of assistance"* within the meaning of section 111, and that HUD could not, as a practical matter, *"terminate payments"* to Kansas City before they began.

Whether HUD must comply with the notice and hearing requirements of section 111 when it proposes to terminate a grant prior to final approval and before disbursement of funds is a "pure question of statutory construction" governed by the familiar standard of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If, under the first prong of *Chevron* analysis, we can determine congressional intent by using "traditional tools of statutory construction," then that interpretation must be given effect. *United Food & Commercial Workers*, 484 U.S. at 123, 108 S.Ct. at 420. If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," then we will defer to a "permissible" agency construction of the statute. *Chevron*, 467 U.S. at 843, 104 S.Ct. at 8781. In the instant case, we conclude that whether section 111 applies to the termination of Kansas City's UDAG agreement is a question properly analyzed under the second prong of *Chevron*.

Like the First Circuit in *City of Boston v. HUD*, 898 F.2d 828, 832 (1st Cir.1990), we find that the statute is ambiguous with respect to notice and hearing requirements when, as here, a grant agreement is terminated prior to final approval and funds disbursement.[2] Section 111 extends generally to all Title I programs, and the UDAG program is undeniably a part of Title I. But the UDAG program was added to Title I in 1977, three years after the Act's initial passage, and we can find nothing to indicate that Congress ever considered the precise manner in which section 111 might apply to termination of UDAG agreements prior to funds disbursement.

We also find in the statute an implicit delegation of interpretive authority to HUD. This result is critical to our analysis, for it is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construc-

---

**2.** Even while analyzing the question under the first prong of *Chevron*, the First Circuit recognized that section 111 may be read either broadly or narrowly, and that its meaning shifts with the interpretative approach chosen. *See* 898 F.2d at 832–33. We agree with the First Circuit that section 111 is not unambiguous in its scope. Unlike the First Circuit, however, we find that this ambiguity requires us to analyze the question under *Chevron* step two.

tion for review under the deferential second prong of *Chevron*. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority.... Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* The requisite legislative intent may be inferred when, as in the present case, resolution of an interpretive question turns on the reconciliation of multiple and potentially competing statutory purposes. *Id.* at 865, 104 S.Ct. at 2792. By declining itself to strike an exact balance between procedural protections, on the one hand, and funds availability and grantmaking expediency, on the other, Congress implicitly delegated to HUD the authority to accommodate those interests through its own interpretation of section 111.

Given both ambiguity and implicit delegation of interpretive authority, we are required to analyze the statutory question with respect to the meaning of section 111 under the second prong of *Chevron*. Pursuant to this analysis, we must defer to "a reasonable interpretation made by the administrator of [the] agency." *Id.* at 844, 104 S.Ct. at 2782. But where the agency's administrator has failed to provide us with a reasonable construction to which we can defer, we must remand to the agency for consideration of the statutory question in the first instance. *See Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325, 1343 (D.C.Cir. 1989) ("when dealing with an ambiguous statutory term ... a court should not interpose its own interpretation of the term *before* the agency has an opportunity to consider the issue and fix on its own statutory construction") (emphasis in original); *King Broadcasting Co. v. FCC*, 860 F.2d 465, 470–71 (D.C.Cir.1988).

In this case, we conclude that HUD has offered no interpretation of section 111 entitled to judicial deference under the second prong of *Chevron*. The agency construction for which HUD seeks deference was never promulgated by the Secretary, or his designee, nor by administrative regulations, nor by decisions in agency adjudications; rather, agency counsel contends that the "permissible construction of the statute" for which it seeks approval as the agency's litigation posture in this case. For purposes of *Chevron*, this is patently insufficient. That counsel advances a particular statutory interpretation during the course of trial does not confer upon that interpretation any special legitimacy. Deference under *Chevron*, even in the context of informal adjudication, can be accorded only to a judgment of the agency itself. *See Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782 (the Court refers to "a reasonable interpretation made by the administrator of an agency").

A different result would be utterly inconsistent with the larger scheme of the administrative review in which we engage. "Arbitrary and capricious" review under *State Farm* and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *see* part "B." *infra*, demands evidence of reasoned decisionmaking *at the agency level;* agency rationales developed for the first time during litigation do not serve as adequate substitutes. *See, e.g., Overton Park*, 401 U.S. at 419, 91 S.Ct. at 825 (" '*post hoc*' rationalizations ... have traditionally been found to be an inadequate basis for review"). We can see no reason to demand anything less of agencies when we review their statutory interpretations under the second prong of *Chevron*. In whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some *post hoc* rationale developed as part of a litigation strategy.

Accordingly, we remand to HUD with instructions to consider whether section 111's procedural protections apply when a city's UDAG agreement is terminated prior to final approval and funds disbursement as well as after. We agree with HUD that reading "terminate payments" to cover situations in which payments have yet to commence is somewhat cumbersome. At the

same time, however, the UDAG program is a part of Title I, to which section 111 undeniably applies. Moreover, section 111(a)(3), authorizing the agency to "limit the availability of payments" to projects unaffected by noncompliance, apparently contemplates action prior to funds disbursement as well as after, at least where a recipient is involved in more than one ongoing project. Even HUD's own practice seems to endow parties to UDAG agreements with a protected status different from that of applicants: at the time a former UDAG "applicant" receives preliminary approval and signs a grant agreement, it becomes a "recipient" under the UDAG regulations and the terms of the grant agreement itself. *See* 24 C.F.R. § 570.460(c)–570.462 (1990); Grant Agreement, *reprinted in* J.A. II 1.

Finally, it is worthy of consideration that compliance questions regarding UDAG agreements are most likely to arise *before* payments commence. As the First Circuit noted, *see Boston v. HUD,* 898 F.2d at 833, and no party seems to dispute, HUD often will be able to determine in advance of any disbursement of funds whether UDAG grantees are in compliance with Title I, as recipients must submit comprehensive applications prior to execution of their agreements and may start construction prior to final approval, *see* 24 C.F.R. § 570.458, 570.462 (1990). Termination of grants for noncompliance is, therefore, more likely to occur before funds disbursement than after, and reading section 111 to cover only post-disbursement terminations could deprive UDAG grantees of procedural protection at precisely the stage when it is arguably most needed.

Resolution of Kansas City's statutory claim requires that HUD determine whether, in light of all of these factors, section 111 is properly read as inapplicable when UDAG agreements are terminated before final approval and funds disbursement. Accordingly, we remand to the agency for initial consideration of this statutory question.

## B. *Substantive "Arbitrary and Capricious" Review (The* State Farm *Issue)*

The second question before us is whether HUD's action in terminating the grant agreement was "arbitrary or capricious." *See* 5 U.S.C. § 706 (1988). Even if HUD may permissibly read section 111 as allowing termination of Kansas City's UDAG agreement without notice and hearing, the agency termination action remains subject to the independent arbitrary and capricious standard of review. *See, e.g., American Horse Protection Ass'n v. Yeutter,* 917 F.2d 594, 597–98 (D.C.Cir.1990) (where agency acts within scope of statutory authority, court must still determine whether action was arbitrary or capricious); *Adams House Health Care v. Sullivan,* 895 F.2d 767, 769–71 (D.C.Cir.1990) (same); *International Bhd. of Elec. Workers v. ICC,* 862 F.2d 330, 338 (D.C.Cir.1988) (same). Because we find that HUD has failed to engage in the reasoned decisionmaking dictated by this standard, we remand to the agency for reconsideration.

In applying the "arbitrary and capricious" test, we review the "administrative record," *Overton Park,* 401 U.S. at 419, 91 S.Ct. at 825, to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *id.* at 416, 91 S.Ct. at 824. Whether the agency action was arbitrary and capricious is a determination we must make *de novo.* *See City of Las Vegas v. Lujan,* 891 F.2d 927, 931–32 (D.C.Cir.1989); *Costello v. Agency for Int'l Dev.,* 843 F.2d 540, 543 n. 5 (D.C.Cir.1988).

Examining the record created by HUD in this case, we focus our analysis on the three agency decisions regarding the termination of Kansas City's UDAG agreement: the HUD letters of January 28, March 19 and October 31, 1985. Like the District Court before us, *see Kansas City v. HUD,* slip op. at 8–10, *reprinted in* J.A. I 358–60, we find that all three decisions reflect a single-minded agency concern with the alleged *untimeliness* of Kansas City's evidentiary submission. The District Court held that the agency acted reasonably in

terminating the grant agreement because the evidentiary submission was found to be untimely. However, as the agency now concedes, the District Court was mistaken on this point. It is clear from the record that Kansas City made its evidentiary submission in compliance with the deadline established by the January 28 notice letter, so HUD's decision cannot be justified on any claim that the city's submissions were untimely. Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard. *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866; *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823.

On appeal, counsel for the agency advanced an alternative argument, claiming that HUD relied not on the purported untimeliness of Kansas City's evidentiary submission but instead on the submission's qualitative inadequacy. *See* Brief for Appellees at 10–14. However, not one of the three agency decision letters makes any reference to the deficiencies in the submission on which HUD counsel would now rely. Nor can other communications between HUD and Kansas City officials to which counsel now points fill this gap. To judge the adequacy of agency decisionmaking, we must look to the agency decisions themselves. And none of HUD's three decision letters incorporates these secondary communications, nor refers to them in any way as the basis for the agency action.

Moreover, even if we were willing to look beyond the agency decisions purporting to dispose of this case and consider HUD's argument that the submission was qualitatively defective, we would find ourselves confronted with an unresolved factual dispute. HUD claims that Kansas City failed to include certain documents in its evidentiary submission; Kansas City claims that the necessary documents were, in fact, included. This is precisely the kind of issue that HUD should have reviewed and discussed in its decisions in this case. If the agency intended somehow to indicate that it had addressed and resolved this question, its efforts were entirely unsuccessful.

On the agency record before us, we can discern no reasoned explanation for the termination of Kansas City's UDAG agreement. If, indeed, the termination was based on substantive deficiencies in the city's evidentiary submission, rather than on a mistaken belief that the submission was untimely, then that fact should have been made plain in the agency decisions. We cannot accept as evidence of reasoned decisionmaking a *post hoc* rationalization for agency action. Therefore, we hold the termination action in this case arbitrary and capricious and remand to the agency for further consideration.

### III. Conclusion

For the reasons set forth above, we remand this case to HUD. The agency must consider, in the first instance, its authority under section 111 of the HCDA to terminate without notice or opportunity for hearing a UDAG agreement prior to final approval. The agency must also reconsider its decision in this case to terminate the Kansas City UDAG agreement. Accordingly, the judgment of the District Court is reversed and the case is remanded to the agency.

*So ordered.*

D.H. GINSBURG, Circuit Judge, concurring:

I concur in the opinion of the court with the understanding that the final three paragraphs of Section II.A. do not suggest any view on the merits of the arguments to be presented to HUD on remand.