# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 3, 2012         Decided April 3, 2012

No. 10-5385

NORTHERN AIR CARGO, ET AL.,
APPELLANTS

v.

UNITED STATES POSTAL SERVICE AND PENINSULA AIRWAYS,
INC.,
APPELLEES

Consolidated with 10-5402, 11-5149

Appeals from the United States District Court
for the District of Columbia
(No. 1:09-cv-02065)

*Amy L. Brown* argued the cause for appellants/cross-appellees. With her on the briefs were *Pierre H. Bergeron* and *Jeremy W. Dutra*.

*Mitchell P. Zeff*, Assistant U.S. Attorney, argued the cause for appellee United States Postal Service. With him on the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney, *R. Craig Lawrence*, Assistant U.S. Attorney, and *Michael J. Elston*, Chief Counsel, United States Postal Service.

*Christopher T. Handman* argued the cause for appellee/cross appellant Peninsula Airways, Inc. With him on the briefs were *Robert E. Cohn, Patrick R. Rizzi*, and *Mary Helen Wimberly*.

Before: SENTELLE, *Chief Judge*, SILBERMAN and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Concurring opinion filed by *Chief Judge* SENTELLE.

SILBERMAN, *Senior Circuit Judge*. This case is a partial primer as to how *not* to defend or adjudicate a challenge to agency action in federal district court. The Postal Service determined, in two informal adjudications, that Peninsula Airways ("PenAir") was qualified to carry (could be "tendered") "nonpriority bypass mail" on five Alaska routes. This awkward term refers to types of freight – not ordinary mail – which are carried by planes to small communities in that vast state that are largely unreachable by surface transportation.[1] Presumably, by shipping such goods under the auspices of the Post Office, the federal government defrays part of the cost. The word "bypass" is used because the freight is never handled by the Post Office's processing facilities. The word "nonpriority" apparently refers to a slower delivery time than "priority" mail, but since the parties do not suggest a difference relevant for this case between priority and nonpriority bypass mail, we will, henceforth, use only "bypass mail" to refer to the types of freight at issue.

The Postal Service acted pursuant to the Rural Service Improvement Act of 2002 ("the Act"), which permitted PenAir

---

[1] It does not, however, include all large freight.

to enter the five routes as what is termed a "mainline bypass mail carrier" (essentially those that fly large planes) only if it met certain statutory conditions.

Three competing carriers, who presently divide the market, sued twice to challenge the Postal Service's determinations as contrary to the Act. Although it initially issued an extraordinary injunction preventing the tender to PenAir, the district court ultimately concluded that the Postal Service's position was authorized. The three competing carriers appealed, and PenAir cross-appealed part of the district court's initial determination.

Contrary to the district court, we think that the three relevant statutory sections are quite ambiguous – indeed one is hopelessly so – and because we have no authoritative Postal Service interpretations of the statute before us, we vacate the district court's judgment with instructions to remand to the Postal Service.

I

The small towns involved in this case, Dillingham, King Salmon, Aniak, McGrath and Unalakleet, can be accessed only by plane or boat, and they depend on bypass mail for food, hospital supplies, generators and other necessities. Although small towns, these locations are called "hub points" from which even smaller settlements are reached. All bypass mail sent to them originates in either Anchorage or Fairbanks. The private air carriers who deliver bypass mail are compensated by the Postal Service (with Department of Transportation involvement), depending on the type of aircraft the carrier operates and the number of similar carriers serving the same route. Carriers operating smaller planes whose payload capacity is less than 7,500 pounds are termed "bush carriers." Carriers operating larger planes are called "mainline carriers" and they

receive slightly lower rates. Under the Postal Service's "equitable tender" practice, planes of each type get an equal share of the relevant category of bypass mail (mainline or bush) on each route. Thus, each market entrant dilutes the existing carriers' shares proportionately.

To enter the bypass mail market, carriers must apply to the Postal Service for equitable tender of bypass mail on a particular route. The Postal Service then determines whether the carrier satisfies certain eligibility requirements. The Act places particular limitations on a carrier's eligibility for equitable tender on routes that go from Anchorage or Fairbanks to hub points. Ordinarily, the Postal Service can only tender bypass mail on those routes to "existing mainline carriers" (essentially, carriers who were certified and providing mainline bypass mail service as of January 1, 2001). But under an exception at issue here, the Postal Service can also tender to a "new 121 mainline passenger carrier" if the new carrier provides substantial passenger service and meets other requirements.[2]

Appellants Northern Air Cargo, Tatonduk Outfitters Limited (Events Air Cargo), and Lynden Air Cargo are all existing mainline carriers who have received equitable tender of mainline bypass mail on some or all of the five routes from Anchorage to the hubs of Dillingham, King Salmon, Aniak, McGrath, and Unalakleet. Though appellants provide bypass

---

[2] *See* 39 U.S.C. § 5402(a)(4) (defining "bush carrier"); *id.* § 5402(a)(11) (defining "equitable tender"); *id.* § 5402(a)(13) (defining "mainline carrier"); *id.* § 5402(g)(4)(A) & (5) (identifying restrictions on eligibility for equitable tender from Anchorage or Fairbanks to hub points). A "121 passenger carrier" means a carrier that provides scheduled passenger service pursuant to operating requirements under part 121 of title 14, Code of Federal Regulations. *Id.* § 5402(a)(16) & (23).

mail and other freight services on these routes several days a week, none provide regular passenger service.

Until 2009, appellee PenAir served these five routes as a bush carrier, primarily carrying passengers. Before 2001 – this becomes controversial – PenAir also carried some *bush* bypass mail on these routes. In July and August of 2009, after upgrading its fleet to include larger planes, PenAir requested equitable tender of *mainline* bypass mail on these routes as a new 121 mainline passenger carrier. PenAir emphasized its plans to provide daily passenger as well as cargo service, which would make it the only regular provider of mainline passenger service on the five routes. The Postal Service granted PenAir equitable tender on all five routes in two letters written by the Program Manager of Intra-Alaska Air Transportation Policy in August and September 2009. The only explanation offered was that "[h]aving reviewed the matter, we have concluded that your letters describe service which would make you eligible for the equitable tender you have requested in those markets." In August, PenAir began operating as a mainline carrier, and on November 9, 2009, the Postal Service began tendering mainline bypass mail to PenAir on the five routes.

Appellants sued the Postal Service, arguing before the district court that the Postal Service had exceeded its statutory authority. Under appellants' reading of the Act, PenAir was ineligible for equitable tender as a new mainline passenger carrier because it was not a "new" carrier. Even if it were, appellants argued, a "Prior Service and Capacity Requirement" applied to PenAir and it had not been satisfied. That requirement makes mainline carriers eligible for equitable tender on a route only after they have provided the requisite "scheduled service," *i.e.*, two noncontract flights within Alaska per week for

at least a year.[3] PenAir intervened, and the parties cross-filed motions for summary judgment. The district court ruled in part for the Postal Service and PenAir, holding that the definition of a "new" carrier was unambiguous and that PenAir qualified. But the court also decided in part for appellants, holding that the Prior Service and Capacity Requirement was also supposedly unambiguous, applied to PenAir, and had not yet been satisfied.

To be sure, the district court criticized the Postal Service's explanation of its decision as a "vague assertion [which] fails to reflect any deliberative process." But, because the court thought the statute susceptible of only one interpretation, it enjoined the Postal Service from tendering mainline bypass mail to PenAir until PenAir satisfied the Prior Service and Capacity Requirement, in what it called a "final appealable Order." Accordingly, the Postal Service ceased tendering mainline bypass mail to PenAir. Appellants appealed the "new" carrier ruling, and PenAir, but not the Postal Service, conditionally cross-appealed the Prior Service and Capacity Requirement ruling.

PenAir resubmitted its request for equitable tender, arguing that it had already satisfied the Prior Service and Capacity Requirement by flying the requisite number of scheduled flights for the thirteen months between August 2009 (when PenAir started operating as a mainline carrier) and September 2010 (when the district judge entered its injunction). Appellants objected that PenAir could not have possibly satisfied the requirement. According to appellants, *no* service – passenger or cargo – provided while PenAir received tender of bypass mail

---

[3]*See* 39 U.S.C. § 5402(g)(1)(A)(iv). "Scheduled service" refers to flights available to the general public based on a schedule published in advance, and appears to include either passenger or cargo service. *Id.* § 5402(a)(18).

could be counted toward the requirement, and ten of the thirteen months should therefore have been excluded from calculations.[4] And less than thirty days had elapsed since the district court's order, so the requirement could not have been satisfied in the meantime. Appellants requested an opportunity to participate in the process. The Postal Service apparently never responded, although it did seek clarification from the district court as to whether the injunction precluded the Postal Service from crediting PenAir's prior service.[5] Instead it granted PenAir's request. Its only explanation was that "[t]he Postal Service has validated that the Prior Service and Capacity Requirement . . . has been met by PenAir. Additionally, PenAir satisfies the definition of 'new' 121 mainline passenger carrier . . . based on the Postal Service's interpretation as well as the [district court's] decision." The letters indicated that the Postal Service was crediting all thirteen months in which PenAir provided scheduled mainline passenger service on the five routes toward the Prior Service and Capacity Requirement. On December 6, 2010, the Postal Service resumed tendering mainline bypass mail to PenAir on the five routes.

Appellants again sued the Postal Service, claiming, as they had before the Postal Service, that PenAir still had not satisfied the Prior Service and Capacity Requirement. The district court granted summary judgment to the Postal Service and PenAir,

---

[4]For three of the thirteen months – between August 2009 and November 2009 – PenAir was providing scheduled service as a mainline carrier but had not yet received tender of bypass mail. Appellants do not dispute that those three months can be counted toward the Prior Service and Capacity Requirement.

[5]The district court thereafter indicated that this issue was not addressed by the injunction.

again finding the statutory language unambiguous. Appellants also appeal this decision.

## II

We encounter, at the outset, an ostensible jurisdictional problem. PenAir asserts we have no authority to review the district court's determination, in its first decision, that PenAir qualified as a new mainline carrier, which appellants appealed. The district court, it is argued, should have remanded the case after it determined that PenAir qualified as a new carrier but was obliged to satisfy the Prior Service and Capacity Requirement, so that the Postal Service could determine whether and how the requirement was satisfied. It is axiomatic that a private party – unlike the government – may not appeal a district court's order remanding to an agency because it is not final. *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 19-20 (D.C. Cir. 2008). And under our precedent, if a district court should have remanded – which, as we point out below, is certainly true here – for jurisdictional purposes, we treat a private party's appeal as if the district court did remand. *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1012 (D.C. Cir. 1999).

But whether the district court's first decision – which it unequivocally labeled a "final appealable Order" – was not actually appealable is a red herring. That is so because we are not merely faced with an appeal from that decision. The Postal Service engaged in further proceedings after that decision to determine whether the Prior Service and Capacity Requirement had been met. The district court reviewed that determination, and its second decision, upholding the Postal Service, was unquestionably a final order; it, too, was appealed. The only real question is whether we may consider the new carrier *issue* in the second appeal, which is undeniably properly before us. That is not a jurisdictional matter; it is only a prudential question

as to whether the argument was properly presented. To be sure, appellants did not fully reiterate the new carrier argument in the second proceeding before the district court. But they did, in a footnote, remind the court that they still challenged PenAir's status as a new carrier, and that they had appealed that issue (they certainly presented the argument to us in their brief). Moreover, in PenAir's motion before us to dismiss the first appeal, it pointed out that appellants had "already filed a new lawsuit challenging the Postal Service's recent decision following" the *de facto* remand, and that "[a]n appeal from that decision will allow this court to review not only the new rulings made in that remand proceeding, *but also the rulings made by the district court in its earlier decision*." PenAir further stated that it "believes that judicial economy favors having all issues – whether from the earlier action or the remand action now back before the District Court – resolved in a single appeal." Just so. We agree with PenAir's earlier (if inconsistent) position and, therefore, take up the new carrier issue, as well as the other two.

### III

We should note, preliminarily, that the Postal Service is exempt from review under the Administrative Procedure Act, but its actions are reviewable to determine whether it has acted in excess of its statutory authority. *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003).

The new carrier dispute turns primarily on the interpretation of 39 U.S.C. § 5402(a)(15), which defines a "new" carrier as, *inter alia*, one that "began providing nonpriority *bypass mail service* on a city pair route in the State of Alaska *after* January 1, 2001"(emphasis added). Although PenAir, as noted, operated as a bush carrier on at least some of the relevant routes before that date, it and the Postal Service assert that the term "bypass mail service," used in determining whether PenAir is a "new

121 *mainline* passenger carrier," means only mainline bypass mail service, not any bypass mail service. Of course, appellants contend that the term refers to both mainline and bush bypass mail service, and since PenAir carried bush bypass mail service prior to 2001, it could not be considered "new." It would appear that, examining the language, either interpretation is plausible.

The second question, assuming PenAir qualifies as a new carrier, is whether it is obliged to meet the Prior Service and Capacity Requirement when it is the only carrier on a route providing passenger service. That depends on the proper interpretation of one of the most extraordinary pieces of statutory language we have ever encountered. Ordinarily, under the so-called "Incumbent Provision," a new mainline passenger carrier who seeks to enter a route where an existing mainline carrier already provides passenger service is eligible for equitable tender only if it meets the Prior Service and Capacity Requirement and satisfies certain passenger carriage thresholds. However, there is an exception – the wondrous paragraph entitled "No Incumbent Provision" – at issue here. It states, "*Notwithstanding subparagraph (A)* and paragraph (1)(B), a new 121 mainline passenger carrier, otherwise qualified under this subsection, may immediately receive equitable tender of nonpriority mainline bypass mail to a hub point in the State of Alaska if": (1) "the carrier *meets the requirements of subparagraphs (A)*, (C), and (D) of paragraph (1) and subsection (h)(2)(B)"; and (2) no mainline carrier currently provides passenger service on the route.[6] "Subparagraph (A)" refers to the Incumbent Provision, and, by reference, the Prior Service and Capacity Requirement.

---

[6] 39 U.S.C. § 5402(g)(5)(A) ("Incumbent Provision"); *id.* § 5402(g)(5)(C) (emphasis added) ("No Incumbent Provision"). As noted, no other mainline carrier is providing passenger service.

Appellants argue with a straight face that the phrase "the carrier meets the requirements of subparagraphs (A), (C), and (D) of paragraph (1)" unambiguously makes the Prior Service and Capacity Requirement applicable. Similarly, PenAir argues that the contradictory earlier words "Notwithstanding subparagraph (A)" clearly waive that requirement, and that the phrase "immediately receive equitable tender" confirms that Congress did not insist that carriers provide twelve months of scheduled service before being eligible for equitable tender to communities in need of passenger service. It should be obvious, however, that the No Incumbent Provision is dreadfully ambiguous, indeed, self-contradictory. It refers to a provision – subparagraph (D) – that does not exist, and, more directly relevant, it simultaneously exempts and imposes the Prior Service and Capacity Requirement. The No Incumbent Provision requires one to read out one clause in favor of another; to claim that the section's meaning is plain, as the opposing carriers do, borders on the absurd.

The third issue, relevant only if the Prior Service and Capacity Requirement applies, is whether Pen Air "ha[d] provided scheduled service" for "at least [2] flights each week . . . between 2 points within the State of Alaska for at least 12 consecutive months with aircraft . . . over 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at the intra-Alaska mainline service mail rate" in December 2010.[7] The precise question is whether the Postal Service can count the ten consecutive months of scheduled service that PenAir provided after the Postal Service initially selected PenAir for equitable tender in November 2009, but before the district court enjoined the carriage of bypass mail. Appellants argue that the phrases "have provided scheduled service" and "before nevertheless being selected" preclude the Postal Service

---

[7]*Id.* § 5402(g)(1)(A)(iv) & (B).

from counting *any* scheduled service – passenger or cargo – that PenAir provided *after* it was "selected"; in other words, after it received the disputed tender in November 2009. PenAir and the Postal Service counter that "before being selected" refers to the Postal Service's second December 2010 selection of PenAir for equitable tender. So long as PenAir provided twelve consecutive months of scheduled service before then, the requirement is satisfied. Again, either interpretation of that language is plausible.

Opposing counsel also heroically, if unpersuasively, present all sorts of structural and policy arguments to show that the statute can *only* be interpreted in accordance with their respective positions. We do not think it is at all necessary to recount those arguments.[8] Suffice it to say that they hardly establish a plain meaning of the statutory sections. Nor are we faced with the necessity of deciding, in the first instance, what the statute meant.

\* \* \* \*

The government argues in the alternative that the Postal Service's interpretation of all the disputed language is entitled to deference, preferably under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), but at least under *United States v. Mead Corp.*, 533 U.S. 218 (2001). The difficulty with the government's argument is that the Postal Service never actually advanced any interpretation, let alone an authoritative one. As we noted, the two informal adjudication letters were simply conclusory; no attempt was made to parse or reconcile the ambiguous statutory language. At oral argument, faced with judicial concerns about the lack of an agency

---

[8]They do show that prominent law firms, let loose, can do an exhaustive job trying to turn a statutory sow's ear into a silk purse.

interpretation, government counsel (for the first time) pointed to a December 2010 declaration by a "network operations specialist" introduced in the federal district court, which repeated the conclusory statements in the letter (as well as adding an irrelevancy).[9]

Although, as we have observed, the Postal Service is exempt from APA review, that only means, essentially, that procedural restraints placed on agencies by that statute, which went beyond pre-existing administrative law requirements, do not apply. Long before passage of the APA, the Supreme Court had held in the seminal case of *SEC v. Chenery*, 318 U.S. 80 (1943), that agency action – in that case apparently an informal adjudication – can be upheld only on the basis of a contemporaneous justification by the agency itself, not *post hoc* explanation of counsel.[10] And we have held that that proposition applies to statutory interpretations. *See, e.g.*, *City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 192 (D.C.

---

[9]One might have thought government counsel would have forthrightly conceded that the Postal Service failed to advance an interpretation of the statutory language.

[10]In *Women Involved in Farm Economics v. United States Department of Agriculture*, 876 F.2d 994, 998-99 (D.C. Cir. 1989), we held that an APA exception exempting rules on public benefits from 553(c), the statement of basis and purpose requirement of rulemaking, meant that an agency could justify such a rule first when challenged in litigation. That, however, was a highly specific exemption specific to 553, not, as here, a general exemption from the APA; we think it clear that the former applies more strongly. Additionally, a rule's purpose is, in a sense, self-evident, whereas an unexplained decision in an informal adjudication based on an ambiguous statute is another matter. Congress would have to specifically excuse an agency from providing the *Chenery*-required contemporaneous explanation to clearly allow *post hoc* explanations by counsel in such a situation.

Cir. 1991). As *Chevron* held, the reconciliation of statutory ambiguity is itself laden with policy implications. 467 U.S. at 844-45.

Although the U.S. Attorney's Office, defending the Postal Service, has offered an interpretation of at least two of the three disputed sections of the Act, we are not willing to accept those as authoritative Postal Service statutory interpretations; that would be quite inconsistent with *Chenery's* teaching. And it is unnecessary to decide whether the Postal Service could have successfully submitted an authoritative interpretation after it was sued, because it has not done so even to date. As should be apparent from what we have said, we think the proper course is to direct the district court to remand to the Postal Service to gain authoritative and careful interpretations of the disputed provisions.

We do not believe, however, that the decisions of the Postal Service should be vacated. The appropriateness of vacating an inadequately explained agency action depends on whether (1) the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

Here, we think it at least likely – in light of the deference we owe to the Postal Service's interpretations of the Act – that on remand, the Postal Service will be able to advance reasonable interpretations of the provisions at issue. Although the Postal Service acted through informal adjudication which, under *Mead*, is not presumptively entitled to *Chevron* deference, the Postal Service does enjoy broad authority to issue regulations and, of even more importance in indicating that Congress expressed particular trust in the Postal Service, is the exemption Congress

granted from the APA. That means to us that if the Postal Service were to offer on remand an authoritative interpretation of the disputed provisions, that interpretation would be entitled to *Chevron* deference. And it is because we perceive that such an interpretation supporting the determination to tender bypass mail to PenAir is probably achievable that we decline to direct the district court to vacate the Postal Service's determination.

The record also suggests that the price of vacating the Postal Service's equitable tender of the five routes to PenAir in the interim could be high. Though PenAir is one of many nonpriority bypass mail carriers on the five routes, on several it is the only carrier of priority mail. The Postal Service estimates that if PenAir no longer received equitable tender of bypass mail on these routes, the costs of priority mail rate transportation would increase by at least 40%. The record further indicates that PenAir can afford to be the lone provider of regular daily passenger service on the five routes only as long as it receives revenues from carrying bypass mail. Under these circumstances, vacatur is unwarranted.

From our discussion, it should be apparent that we disagree with the district court's disposition of this dispute. The district court should have remanded the case, at the outset, to the Postal Service for a complete and authoritative agency interpretation of the statute because it is quite obviously ambiguous. *See City of Kansas City*, 923 F.2d at 192; *Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325, 1343 (D.C. Cir. 1989). As the district court noted, the agency's decision, although applying the statute, lacked any careful analysis or explanation. Such an explanation is needed to satisfy *Chenery* (and, as an interpretation, to merit *Chevron* deference). Indeed, even if the court was correct in concluding the statute was not ambiguous as to the new carrier issue and the applicability of the Prior Service and Capacity Requirement, remand, as we have observed, would have been called for so the

agency could determine whether the Prior Service and Capacity Requirement was met. It was quite anomalous to issue an injunction. When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal. *See, e.g.*, *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995). In this case, the district court's injunction caused considerable confusion; appellants initially, if unsuccessfully, claimed that the Postal Service's second determination was in contempt.

*So ordered.*

SENTELLE, *Chief Judge*, concurring: I fully concur in the judgment of the court, and in the reasoning in the opinion that supports that judgment. I do not join the last paragraph, which I think gratuitously addresses questions not before us and proceeds from a misapprehension of law. First, whatever question there was as to the district court's first disposition is now moot. The second disposition has intervened, and it is the consequence of that disposition that we must now address. *See* Maj. Op. at 8-9. I therefore do not join the court's comments on that first disposition. Secondly, in that paragraph, the court states, "The district court should have remanded the case, at the outset, to the Postal Service for an agency interpretation of the statute because it is quite obviously ambiguous . . . ." Maj. Op. at 15. This reasoning seems to presuppose that the court cannot construe an ambiguous statute in an agency case but must always remand for the agency's interpretation in the first instance. I know of no such rule of law. The *Chevron* principle, arising from *Chevron, U.S.A. Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837 (1984), compels us to accept reasonable agency interpretations of ambiguous statutes where the agency has made such an interpretation. I know of nothing in *Chevron* or its progeny that renders courts impotent to perform their traditional function of statutory interpretation where the agency has not entered an interpretation.

For these combined reasons, I respectfully decline to concur in the last paragraph of the court's opinion. I reaffirm that I join the judgment and the balance of the opinion.